B.F. GOODRICH; Upjohn Company; Dow Corning Corporation; Environmental Waste Resources, Inc.; Reynolds Aluminum Building Products Company; Uniroyal Chemical Co., Inc.; White Consolidated Industries; Kerite Company; Unisys Corporation; Risdon Corp.; Hoechst Celanese Corporation; Cadbury Beverages, Inc.; Coltec Industries, Inc.; Ken–Chas Reserve Co.; United States of America; State of Connecticut; Naugatuck Glass Co.; Naugatuck Treatment Co., Plaintiffs–Appellants,

v.

John BETKOSKI; George Clark; Armstrong Rubber Company; Thomas Ashmore; Borough of Naugatuck; Bristol Flowed Gasket Company; Connecticut Resources Recovery Authority; Dee's, Inc., also known as Dee's Refuse, Inc.; Derby Tire Company; Eastern Company; General Roofing & Sheet Metal Co., Inc.; Gerald Metals, Inc.; C.R. Gibson Company; Hospital Marketing Services Co., Inc.; Ideal Manufacturing Co.; Jacob Brothers, Inc.; Litton Systems, Inc., also known as Winchester Electronics; Manafort Brothers, Inc.; Nasco, Inc.; New Haven Housing Authority; Northeast Utilities; Frank Perrotti & Sons, Inc.; Quality Rubber Co.; Sanitary Refuse Co., Inc.; Seymour Brass Turning Co.; Sperry Rand Corporation; Stauffer Chemical Company; Town of Middlebury; Town of Thomaston; Town of Woodbury; Triangle Industries, Inc.; Turner Construction Company; U.S. Prolam, Inc.; Waterbury Companies, Inc.; Watertown Housing Authority; Zollo Drum Company, Inc.; Atlantic Richfield Co.; Adam's Service Station; Armand's Auto Service; High Ridge Apartments; Ashmore Trucking; Beacon Outing Club; Brass Rail Restaurant; Coffee Shop; Crelan Constr. Co.; Ct. Sheet Metal/Wood Co.; Daddio's; David Rupsis; Edward Betkoski; Elk's Lodge # 967; George's Floor Covering; Horizon Homes; Korvette Services; Latella Carting Co.; Lombard Bros., Inc.;

Long Meadow Cafe; McDonald's Restaurant; Meyers & Schwartz; Neal's Coffee Shoppe; Nelson Mendes; Portanova Trucking Co.; Portuguese Club; Ray's Hardware; Shore's Auto Parts; Steve's Tires; Stop & Shop; Triangle Services; Trowbridge Apts.; Valley Motor Trailer Sales; Valley Mobile Homes Park; Vieira Agency; Waterbury Pressed Metals; Town of Bethany; City of Waterbury; Capozziello Brothers; Town of Killingworth; Town of Beacon Falls; Naugatuck Y.M.C.A.; E. Eric Arsan Refuse; John Ashmore; Joseph Betkoski; Connecticut Pharmacare, Inc., doing business as Ford Pharmacy; First National Supermarkets, Inc.; P. Francini Company; Town of Hamden; Jetzon Tire Co.; City of Milford; NRS Carting Co., Inc.; Town of Orange; Peter Paul Cadbury; Town of Plymouth; Town of Seymour; Town of Stratford; Town of Watertown; Town of Westport, Defendants–Appellees.

Nos. 1268–1271, Dockets 95–6074, 95–6088, 95–6090 and 95–6098.

United States Court of Appeals, Second Circuit.

Argued March 13, 1996.

Decided Nov. 1, 1996.

Peter A. Appel, Washington, DC (David C. Shilton, Peter M. Flynn, Department of Justice, Washington, DC; Lois J. Schiffer, Assistant Attorney General, Christopher F. Droney, United States Attorney, John B. Hughes, Assistant United States Attorney, New Haven, CT; Daniel H. Winograd, Margery Adams, EPA Region I, Boston, MA, of counsel), for Plaintiff–Appellant United States.

510

Kenneth N. Tedford, Assistant Attorney General, Hartford, CT (Richard Blumenthal, Attorney General, Robert D. Snook, Assistant Attorney General, State of Connecticut, Hartford, CT, of counsel), for Plaintiff–Appellant State of Connecticut.

John O'Leary, Portland, ME (Catherine R. Connors, David P. Littell, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, of counsel), for Plaintiff–Appellant Members of the Laurel Park Coalition.

Eric Lukingbeal, Hartford, CT (Brian C.S. Freeman, Bradford S. Babbitt, Robinson & Cole, Hartford, CT, of counsel, and on the brief), for Defendant–Appellee Gerald Metals, Inc.

Frank M. Thomas, Philadelphia, PA (Morgan, Lewis & Bockius, L.L.P., Philadelphia, PA; Michael J. Donnelly, Murtha, Cullina, Richter and Pinney, Hartford, CT; William B. Heinrich, Roger E. Koontz, Silverstone & Koontz, Hartford, CT; Robert L. Trowbridge, Trowbridge, Ide, Mansfield & Schoolcraft, P.C., Hartford, CT, all of counsel, and on the brief), for Defendants–Appellees Armstrong Rubber Co., The Eastern Co., and The Kerite Co.

Nicholas J. Harding, Middletown, CT (Adams, Harding & Conway, Middletown, CT, of counsel), for Defendants–Appellees Manafort Brothers/Connecticut Waste Processing, Inc.; E. Eric Arsan Refuse; NRS Carting Company, Inc.; and Zollo Drum Company, Inc.

Mark Mininberg, New Haven, CT (Katharine S. Goodbody, Mininberg & Goodbody, New Haven, CT, of counsel), for Defendants–Appellees Adam's Service Station, Bank of Boston Connecticut, Bristol Flowed Gasket Co., Inc., The Coffee Shop, Connecticut Sheet Metal, Co., Inc., Crelan Construction Co., Derby Tire Co., Inc., Connecticut Pharmacare, Inc. d/b/a Ford Pharmacy & Medical Supply, First National Supermarkets, Inc., High Ridge Apartments, Hospital Marketing Services, Inc., Horizon Homes, Lombard Bros., Inc./North Penn Transfer, Inc., McDonald's Corp., Nasco, Inc., Naugatuck YMCA, Northeast Utilities, Portanova, Inc., Portuguese Club, Ray's Hardware, Inc., Stauffer Chemical, Steve's Tire and Battery Salvage, The Stop & Shop Companies, Inc., Trowbridge House Apartments, Turner Construction Co., Valley Motor Trailer Sales, Valley Mobile Homes Park, WPM, Inc.

William A. Butler, Washington, DC (Steptoe & Johnson, L.L.P., Washington, DC, of counsel), for Defendant–Appellees Municipal Collectors.

John Robacynski, Woodbridge, CT, for Defendants–Appellees Frank Perrotti & Sons, Inc. and Dee's Refuse, Inc.

Edwin L. Doernberger, New Haven, CT (Catherine K. Lin, Sachs, Sklarz, Shure & Gallant, P.C., New Haven, CT, of counsel), for Defendant–Appellee U.S. Prolam, Inc.

Louis R. Pepe, David E. Rosengren, Pepe & Hazard, Hartford, CT, of counsel, filed a joint brief, for Plaintiffs–Appellants B.F. Goodrich; Upjohn Co.; Dow Corning Corp.; Reynolds Aluminum Building Products Co.; Uniroyal Chemical Co., Inc. and Hoechst Celanese Corp.

Barbara S. Miller, Brody and Ober, P.C., Southport, CT; Louis A. Highmark, Jr., Fink & Highmark, West Hartford, CT, of counsel, filed a brief, for Defendant–Appellee Waterbury Companies, Inc.

William H. Narwold, Eric E. Grondahl, Cummings & Lockwood, Hartford, CT, of counsel, filed a brief, for Defendant–Appellee C.R. Gibson Co.

Roger E. Koontz, William B. Heinrich, Silverstone & Koontz, Hartford, CT; Eric Lukingbeal, Brian C.S. Freeman, Robinson & Cole, Hartford, CT, of counsel, filed a joint brief, for Defendants–Appellees The Eastern Company and Gerald Metals, Inc.

Barbara Betkoski, Diane Betkoski, John W. Betkoski, Sr., Beacon Falls, CT, filed a brief, for pro se Defendants–Appellees, Joseph Betkoski and John W. Betkoski, Sr.

Before: CARDAMONE, WALKER, and McLAUGHLIN, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal, arising originally from the disposal of hazardous substances at two Connecticut landfills, Beacon Heights and Laurel Park, requires us to determine whether defendants accused of generating and transporting hazardous substances deposited at the two landfill sites might be liable under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) to contribute to the costs of cleaning up the sites. Under CERCLA, several classes of responsible parties are liable for most costs incurred in responding to and remediating sites where hazardous substances are found. We must, in addition, decide if certain parties remain susceptible to suit by the United States and the State of Connecticut for response costs incurred by these governments.

Plaintiffs-appellants the United States, the State of Connecticut, the Beacon Heights Coalition, and the Laurel Park Coalition appeal from a judgment entered May 2, 1995 by the United States District Court for the District of Connecticut (Dorsey, C.J.). The court granted judgment on the pleadings against the United States and Connecticut and granted summary judgment against the Beacon Heights Coalition and the Laurel Park Coalition and in favor of nearly 100 defendants alleged in plaintiffs' complaints to be potentially responsible parties in an action under CERCLA, 42 U.S.C. §§ 9601–9675, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986).

The Beacon Heights and Laurel Park Coalitions are groups of industrial waste generators that sought contribution from third parties after having settled their liability with the United States, the State of Connecticut, and the Murthas and affiliated entities—the owners/operators of the two landfill sites. The Laurel Park Coalition sought initially to add 1151 other potentially responsible parties to the litigation. The district court ground away at this number slowly, yet it "ground exceeding small." Insisting that these plaintiffs only implead those parties against whom they had a claim that was both legally and factually substantiated, the dis-

trict court reduced to 41 the 1151 third party defendants that these plaintiffs moved to add, thus eliminating over 1000 potential parties from the suit.

Later, with motions for summary judgment before it, the district court construed some of CERCLA's basic provisions in a manner inconsistent with our precedents and, ruling that the coalitions had failed to advance sufficient proof, thereby was able to grant summary judgment to nearly all of the roughly 100 defendants, dismissing plaintiffs' complaints against them. The district court also found that both governments had been fully reimbursed by the industrial coalitions and the landfills' owners and therefore granted summary judgment against these governments.

## BACKGROUND

We assume the reader's familiarity with our previous decision in this case, *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192 (2d Cir. 1992) (*Murtha I* ), and with the published decisions of the district court relevant to this appeal. *See B.F. Goodrich Co. v. Murtha*, 815 F.Supp. 539 (D.Conn.1993) (*Murtha II* ); *B.F. Goodrich Co. v. Murtha*, 840 F.Supp. 180 (D.Conn.1993) (*Murtha III* ); *B.F. Goodrich Co. v. Murtha*, 855 F.Supp. 545 (D.Conn. 1994) (*Murtha IV* ). We detail only those background facts necessary to an understanding of this appeal. Those facts relevant to the discussion of a specific issue and necessary to its disposition will be included in the analysis.

### A. *Initial Litigation*

The Beacon Heights and Laurel Park landfills have both been designated as Superfund sites by the Environmental Protection Agency (EPA). Terrance and Harold Murtha, and several corporations controlled by them (collectively, Murtha), owned and operated Laurel Park from 1961 until 1987, and owned and operated Beacon Heights from 1970 to 1987. In 1987 Murtha was sued in separate actions by the EPA, the State of Connecticut's Department of Environmental Protection (DEP), Uniroyal Chemical Company, Inc., and a coalition of corporations led by

B.F. Goodrich Company. Murtha filed third party actions for contribution or indemnification against some 200 third party defendants. These parties were accused either of generating or of transporting hazardous substances to the landfills. Most of the defendants named in the Murtha third party suits were not named by the EPA as potentially responsible parties. *Murtha I*, 958 F.2d at 1196.

In September 1987, when the Murtha litigation began, the EPA entered into a consent decree concerning the remediation of Beacon Heights with 33 potentially responsible parties who may have generated hazardous substances that were later deposited in that landfill. These parties, later known as the Beacon Heights Coalition,[1] agreed to undertake the remediation of that site and to reimburse the government for its future oversight costs in excess of $500,000. Since this coalition did not provide for past costs or for those future response costs unrelated to oversight, the EPA sued several non-settling potentially responsible parties[2] in a separate action to recover its past and future remediation costs.

The EPA also filed two lawsuits concerning the costs of remediating the Laurel Park landfill. One led to a settlement with another industrial coalition of various potentially responsible parties, now known as the Laurel Park Coalition.[3] In an August 1992 consent decree, the Laurel Park Coalition agreed to perform remediation at the site, pay for the government's future oversight costs in excess of $200,000, and pay the EPA $500,000 for its past response costs. The EPA then sued, as it did in the Beacon Heights case, the non-settling potentially responsible parties[4] to recover past costs and future response costs not addressed by the consent decree. The

State of Connecticut, which is also involved in the Laurel Park cleanup, received over $1 million from the coalition for response costs and sued the same non-settling parties for unreimbursed costs.

Murtha also settled its litigation with the United States, with Connecticut, and with the two coalitions (coalitions, plaintiffs, or appellants). The parties embodied their agreement in a consent decree (Murtha consent decree) which also was entered by the district court in August 1992. Murtha resolved its liability at both landfill sites for $5,375,000; this amount was apportioned among several parties. The Beacon Heights Coalition received $1,875,000 and $322,500 was given to the EPA for unreimbursed costs relating to Beacon Heights. Murtha assigned its third party claims to the Beacon Heights Coalition. The EPA also received $625,000 for unreimbursed costs at Laurel Park, as did the State of Connecticut, with the remaining $1,975,000 set aside for remediation at that site. Although the Laurel Park Coalition had not been formed when the Murtha consent decree was negotiated, the parties agreed that should an industrial coalition form within 18 months of the entry of Murtha's consent decree, the coalition would receive the funds. Because this condition was met, the Laurel Park Coalition received the $1.975 million set aside by Murtha. *See Murtha III*, 840 F.Supp. at 183.

Many of the third party defendants were municipalities and municipal corporations that generated and collected municipal solid waste. They claimed that CERCLA exempted municipal waste from its coverage and that an exemption for household waste in the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6992k, was incorporated into CERCLA. The district

---

1. The Beacon Heights Coalition is today composed of seven members: B.F. Goodrich Co.; Dow Corning Corp.; Hoechst Celanese Corp.; Reynolds Aluminum Building Products Co.; Uniroyal Chemical Company, Inc.; Upjohn Co.; and White Consolidated Industries.

2. These non-settling parties at Beacon Heights are: Armstrong Rubber Co.; The Eastern Co.; Kerite, Inc.; Primerica, Inc.; Richard Zollo; John Betkoski; Joseph Betkoski; and George Clark.

3. The Laurel Park Coalition members in this appeal are: Cadbury Beverages, Inc.; Coltec Industries, Inc.; Kerite Co.; Naugatuck Glass Co.; Naugatuck Treatment Co.; Risdon Corp.; Ken–Chas Reserve Co.; Uniroyal Chemical Co., Inc.; and Unisys Corp.

4. The non-settling parties at Laurel Park are: Atlantic Richfield Co.; The Eastern Co.; Gerald Metals, Inc.; and Litton Systems, Inc.

court rejected these arguments, *B.F. Goodrich Co. v. Murtha*, 754 F.Supp. 960 (D.Conn. 1991), and we affirmed, *Murtha I*, 958 F.2d at 1197. The municipal generators therefore remained in the case as named defendants and potentially responsible parties.

### B. *Summary Judgment Decisions*

The Beacon Heights Coalition was already armed with Murtha's assignment of its third party claims against generators and transporters of hazardous substances. The Laurel Park Coalition then moved to add to the action as third party defendants 1151 potentially responsible parties. The district court granted the motion to the extent of allowing 41 parties to be joined, but denied it as to the 1110 other potential parties. *Murtha II*, 815 F.Supp. at 546–61.

In April 1992, approximately six weeks after we rejected the municipal defendants' claim of CERCLA exemption, the district court decided *sua sponte* to permit parties to file motions for summary judgment. Nearly all of the original third party defendants filed such motions. Both coalitions opposed the motions and in turn cross-moved for the same relief. *Murtha III*, 840 F.Supp. at 183.

With dispositive motions before the trial court, the two coalitions became increasingly concerned about their ability to present evidence in support of their contentions that the third party defendants had generated or transported hazardous substances to the landfills. Throughout the proceedings in the trial court, discovery had been limited (independently and through a special master). Uniform discovery orders and case management orders effectively restricted discovery to a set of court-drafted interrogatories. The special master assured the coalitions on several occasions that additional discovery would be permitted. After initially denying the coalitions' request for expanded discovery, the district court in December 1992 allowed some limited deposition discovery. Summary judgment motions were submitted to the court and decided in a series of orders, beginning in December 1993. *See Murtha III*, 840 F.Supp. at 183–191.

Summary judgment was eventually granted to every third party defendant-appellee that had moved for such relief, *id.*, and the district court subsequently dismissed *sua sponte* nearly all the remaining third party defendants, including many that did not move for that relief. Of the 88 defendants sued by the coalitions who had not entered into settlement agreements, all but four were dismissed.

Judgment on the pleadings was entered against the United States and the State of Connecticut in their suits against non-settling potentially responsible parties. *Murtha IV*, 855 F.Supp. at 549. The district court reasoned that the EPA and DEP had presented no figures for incurred response costs that were not covered by the $3,500,000 net *Murtha* settlement, *id.* at 546, and therefore dismissed both governments' claims for additional reimbursement. It also granted summary judgment in favor of the remaining three of the eight defendants at Beacon Heights sued by the EPA.

From an amended judgment entered May 2, 1995, the United States, the State of Connecticut, and both coalitions appeal. We affirm in part, reverse in part, and remand for further proceedings.

## DISCUSSION

The coalitions point to a number of reasons calling for reversal. They contend the district court granted summary judgment to many of the defendants based on a misapplication of substantive CERCLA law, and that instead their cross-motions for summary judgment should have been granted. They also maintain that procedural errors were committed that require reversal.

The trial court's initial decision, *Murtha II*, 815 F.Supp. 539, laid down several broad legal rules, which the court applied, occasionally by reference, in deciding subsequent cases. *See Murtha III*, 840 F.Supp. at 183 ("Many comments on the evidence in [*Murtha II*] are pertinent to the present motions and will not be repeated here."). We address first the coalitions' assertion that the district court incorrectly interpreted CERCLA; second, we consider the coalitions' procedural contentions; third, we review *de novo* the grants of summary judgment in 85

individual cases (with reference to an appendix incorporated in this opinion); and, finally, we address the appeals of the United States and the State of Connecticut.

## I The Law of CERCLA

### A. *Basic Principles*

■ Our construction of CERCLA does not begin with this case. Rather, we are guided by previous writings on this subject in this and other Circuits. CERCLA is a "broad remedial statute," *Murtha I,* 958 F.2d at 1197, and was enacted with the purpose of "[f]irst, assuring that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." S.Rep. 848, 96th Cong., 2d Sess. 13 (1980) (Senate Report), *reprinted in* 1 Senate Comm. on Env't and Pub.Works, Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), at 305, 320 (1983) (Leg.Hist.). As a remedial statute, CERCLA should be construed liberally to give effect to its purposes. *Schiavone v. Pearce,* 79 F.3d 248, 253 (2d Cir.1996). These include facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup, *see Murtha I,* 958 F.2d at 1198, and encouraging settlements that reduce the inefficient expenditure of public funds on lengthy litigation, *see In Re Cuyahoga Equip. Corp.,* 980 F.2d 110, 119 (2d Cir.1992).

CERCLA makes four classes of persons liable—(1) present owners and operators of facilities that accepted hazardous substances, (2) past owners and operators of such facilities, (3) generators of hazardous substances, and (4) certain transporters of hazardous substances. 42 U.S.C. § 9607(a). As we have noted, "[t]he Act's broad reach extends liability to all those contributing—from generation through disposal to—the problems caused by hazardous substances." *Murtha I,* 958 F.2d at 1198. Responsible parties are liable for a broad range of remediation expenses, including all costs of removal of the substances not inconsistent with the national contingency plan, other necessary response costs, damages for injury to natural re-

sources, and the cost of health assessments. *See* 42 U.S.C. § 9607(a)(4).

■ The Act imposes strict liability. Strict liability is intended to make sure that those who "benefit financially from a commercial activity" internalize the environmental costs of the activity as a cost of doing business. Senate Report at 13, Leg.Hist. at 320; *see New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985) (discussing legislative history). Liability under the Act is joint and several, unless potentially responsible parties can prove that the harm is divisible. *See United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721–22 (2d Cir. 1993); *Murtha I,* 958 F.2d at 1198.

A CERCLA plaintiff establishes a *prima facie* case by proving that (1) the defendant is within one of the four categories of responsible parties enumerated in § 9607(a); (2) the landfill site is a facility as defined in § 9601(9); (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan. 42 U.S.C. § 9607(a); *Alcan,* 990 F.2d at 719–20; *Murtha I,* 958 F.2d at 1198.

■ Once a plaintiff makes a *prima facie* showing, a defendant may avoid liability only if it establishes by a preponderance of the evidence that the release or threatened release was caused by an act of God, an act of war, certain acts or omissions of third parties other than those with whom the defendant has a contractual relationship, or a combination of these reasons. 42 U.S.C. § 9607(b). If the plaintiff can establish each of the *prima facie* elements on undisputed facts, and the defendant is unable to demonstrate by a preponderance of the evidence that an affirmative defense applies, summary judgment on liability is appropriate. *Alcan,* 990 F.2d at 720. Significantly, it is *"not* required that the [plaintiff] show that a specific defendant's waste caused incurrence of clean-up costs." *Id.* at 721. Because CERCLA imposes strict liability, there is no causation requirement.

"Hazardous substance" is expansively defined to include

(A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of. the Solid Waste Disposal Act . . . ., (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act . . . , and (F) any imminently hazardous chemical substance or mixture with respect to which the [EPA] Administrator has taken action pursuant to section 2606 of Title 15.

42 U.S.C. § 9601(14). Pursuant to subsection (B), the EPA has listed more than 700 hazardous substances in Table 302.4 of 40 C.F.R. § 302.4 (1995). We have noted that "[t]he breadth of § .9601(14) cannot be easily escaped, and we have expressly held that '[q]uantity or concentration is not a factor.'" *Alcan*, 990 F.2d at 720 (quoting *Murtha I*, 958 F.2d at 1200). In other words, the Act's definition includes "even minimal amounts of pollution." *Alcan*, 990 F.2d at 720.

These propositions presently govern CERCLA litigation in this Circuit. If a district court grants summary judgment based on an incorrect understanding of CERCLA, we must reverse and remand. *See Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir.1994) (reviewing decision granting summary judgment includes determining whether district court correctly applied the law).

### B. *Analysis of District Court's CERCLA Interpretation*

The coalitions aver that many third party defendants-appellees were granted summary judgment based on an erroneous application of CERCLA and the case law interpreting the statute. We address each claim of error.

### 1. *Component Parts*

The district court held, in *Murtha II*, 815 F.Supp. at 546, that "[a]bsent a finding by EPA that a particular product warrants classification as a [hazardous substance] . . . , it cannot be found that the product, notwithstanding its constituent elements, is an [hazardous substance] or [hazardous waste]." It later clarified that holding, by explaining that "mere presence of an element, a named [hazardous substance], as a constituent of a product does not render the product a [hazardous substance]." *Murtha III*, 840 F.Supp. at 184.

In *Murtha I* we rejected the contention that a specific mixture or waste solution must be listed within § 9601(14) or incorporated by reference in order to fall within CERCLA's coverage. We explained that "[w]hen a mixture or waste solution contains hazardous substances, that mixture is itself hazardous for purposes of determining CERCLA liability. Liability under CERCLA depends only on the presence in any form of listed hazardous substances." *Murtha I*, 958 F.2d at 1201; *see also United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 259–61 (3d Cir. 1992) (rejecting quantitative requirement); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir.1989) (same).

■ It is enough that a mixture or waste solution contain a hazardous substance for that mixture to be deemed hazardous under CERCLA. The waste product itself "need not be listed by name—instead of its constituent components—to fall within the Act." *Murtha I*, 958 F.2d at 1201; *see also Louisiana–Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1573 (9th Cir.1994) (holding that even if product not specifically listed as hazardous substance, if components include hazardous substances, product is regulated by CERCLA), *cert. denied*, —— U.S. ——, 115 S.Ct. 780, 130 L.Ed.2d 674 (1995); *Eagle–Picher Indus. v. EPA*, 759 F.2d 922, 930–31 (D.C.Cir.1985) (rejecting contention that because most mining wastes and fly ash contain some hazardous substances, mining wastes and fly ash must therefore be specifically listed as hazardous substances).

Our understanding is also consistent with Congress' plan. Legislative history reveals that "the release of any [listed hazardous or toxic substance] *or any constituent of them* invokes the notice requirements and response provisions and any costs of removal or remedial action or any damages are subject to the liability provisions of the bill."

Senate Report at 24–27, Leg.Hist. at 331 (emphasis added). In short, it makes no difference that the specific wastes disposed of by the appellees were not themselves listed as hazardous substances, because so long as their component parts were listed as hazardous substances there may be CERCLA liability.

Appellees declare this approach will lead to CERCLA liability if a discarded object had any EPA listed hazardous substance in its chemical genealogy, whether or not the chemical component's characteristics had been unalterably changed in the manufacturing process. Even if this objection is sound in theory, it is not relevant. The instant case involves not only discarded objects like pens or plastic containers that might include a hazardous substance in their chemical make-up. Appellees are accused of dumping waste that contained hazardous substances in separable, identifiable forms. According to an affidavit submitted by the coalitions, the cumulative waste stream discarded in the Murtha's landfills included municipal sludge, incinerator ash, varnishes, paints, tar remover, caulking compounds, pesticides, glues, degreasers, and automotive lubricants. Obviously, disposal of this sort of waste poses a greater threat of releasing hazardous substances than is presented by—to use an example offered by the appellees at oral argument—the disposal of a single plastic pen.

In an attempt to avoid this conclusion, appellees invoke *Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992–93 (1st Cir.1995). Blackstone held that the EPA should make an initial determination of whether ferric ferrocyanide (FFC)—in this case a blue-colored substance on wood chips—is a cyanide and therefore a hazardous substance. The First Circuit ruled that even if FFC contained cyanide as a chemical component, the cyanide might not exist in a form convertible to free cyanide and therefore might not be a CERCLA hazardous substance. *Id.* at 990–91. However, in this case, the First Circuit focused on whether FFC was a hazardous substance. It did not suggest that were FFC found to be a hazardous substance, liability might be avoided because "wood chips"—the product allegedly

discarded by the polluter—were not in themselves hazardous substances within the Act's definition. In short, the appellees' reliance on *Blackstone* is misplaced.

Thus, those dismissals in the present case that were predicated on the notion that a waste product is not covered by CERCLA unless specifically listed as a hazardous substance—even when its component parts are hazardous substances—misconstrued CERCLA and must be reversed.

### 2. *Releasability*

The trial court ruled further that "[t]he absence of evidence of breakdown of products that contain [hazardous substances] ... precludes a finding that disposal of that product constitutes a disposal of [hazardous substances]." *Murtha II*, 815 F.Supp. at 545. Later, it explained that statement by saying that "[l]iability does not lie if the material disposed of would release a [hazardous substance] only on the intervention of another force." *Murtha III*, 840 F.Supp. at 188. The coalitions believe that these pronouncements were wrong.

As noted, to make out a *prima facie* CERCLA case, a plaintiff must show a "release, or a threatened release ... of a hazardous substance." § 9607(a)(4). Accordingly, if a hazardous substance is only used in a non-releasable form in the manufacturing of a product, it may scientifically be impossible for the plaintiff to show a "threatened release." Hence, the district court properly required plaintiffs to show a release or threatened release. But, when it required them to show an actual breakdown of products containing hazardous substances, and determined there was no liability if the hazardous substances would only be released by an intervening force, it acted in a manner contrary to precedent.

In *Alcan*, we held that proof that a defendant's waste did not release listed hazardous substances is only relevant to the issue of apportionment of damages, not to the issue of liability. *Alcan*, 990 F.2d at 722. Independent releasability is not required to establish liability; a defendant otherwise liable may show "nonreleasability" in order to

mitigate its share of damages. It follows logically that a defendant who disposes of hazardous substances that are not independently releasable may still be held liable, even though that defendant may not be required to pay damages when the cost apportionment phase of the litigation is reached.

 In addition, the trial court's reading of CERCLA is inconsistent with the Act's language, which provides only the four already recited causation-related defenses. 42 U.S.C. § 9607(b). The canon of construction that says "expressio unius est exclusio alterius" cautions against creating additional exceptions to complex statutory enactments. *Cf. Greene v. United States,* 79 F.3d 1348, 1355 (2d Cir.1996) (applying this principle in the context of federal tax law).

Moreover, if we required a plaintiff to show more than a release or threatened release, we essentially would be asking the plaintiffs to prove that a specific defendant's hazardous substances caused the release of a hazardous substance. No causation is needed, however, to establish liability under CERCLA, *see Alcan,* 990 F.2d at 721, because it is, as stated, a strict liability statute. *See Shore Realty,* 759 F.2d at 1042; *see also Alcan Aluminum,* 964 F.2d at 266 (requiring only that plaintiff prove that hazardous substances were deposited at a site from which there was a release or threatened release that caused response costs to be incurred); *Amoco,* 889 F.2d at 670 n. 8 ("[I]n cases involving multiple sources of contamination, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste.").

None of the lower court cases upon which the district court relied as precedent for its view regarding releasability is persuasive. *See, e.g., United States v. New Castle County,* 769 F.Supp. 591, 597 (D.Del.1991); *United States v. Serafini,* 750 F.Supp. 168, 171 (M.D.Pa.1990). Although appellants must show a release or threatened release in order to make out a *prima facie* case, the additional releasability requirement of product breakdown finds no support in CERCLA.

### 3. *Negligible Amounts*

 The coalitions further contend that the district court impermissibly required a showing that appellees disposed of hazardous substances above a threshold amount. It granted summary judgment to an appellee where the amounts of hazardous substances it disposed of were "minuscule," *Murtha III,* 840 F.Supp. at 184, or "[n]ominal," *Murtha II,* 815 F.Supp. at 545. Twice we have said that quantity "is not a factor" when determining CERCLA liability because had Congress wanted to distinguish liability on the basis of quantity, it would have so provided. *Murtha I,* 958 F.2d at 1200; *see also Alcan,* 990 F.2d at 720 ("The statute on its face applies to 'any' hazardous substance, and it does not impose quantitative requirements."). The absence of threshold quantity requirements in CERCLA leads logically to the conclusion that the Act's "hazardous substance" definition includes even minimal amounts. *See Alcan,* 990 F.2d at 720. The dismissals on these grounds constitute legal error.

### 4. *EPA Designation*

The trial judge implied, in a few cases, that the EPA's decision not to designate a party as a potentially responsible party is relevant in determining CERCLA liability. *See, e.g., Murtha III,* 840 F.Supp. at 184 ("[Appellee] was not designated as a PRP by the EPA."). In *Murtha I,* 958 F.2d at 1205, we concluded that EPA policy "merely indicates that the EPA presently does not intend to pursue enforcement actions against" unnamed parties. However, here the district court weighed the plaintiffs' evidence of liability "against the backdrop of the EPA Municipal Policy that a [party] would not be charged as a PRP absent evidence that its waste deposited at the site in question contained specific [hazardous substances]." *Murtha III,* 840 F.Supp. at 188.

 EPA enforcement decisions are not helpful in deciding whether a party is properly joined as a defendant in a given action. *See Murtha I,* 958 F.2d at 1205 (explaining that EPA prosecutes only largest contributors or those with the means to pay, leaving those defendants to seek contribution from

other potentially liable polluters). This is consistent with the general understanding that "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing." *Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). Congress has explicitly authorized private rights of action independent of EPA enforcement decisions. For these reasons, the agency's decision not to initiate its own enforcement action is irrelevant in determining whether a defendant might be liable under CERCLA.

Appellees maintain that no decision was made in any case in exclusive reliance on the EPA policy, and that the court's reference to that policy was merely illustrative. It is difficult to see what the EPA policy illustrated, as we have ruled that the policy is legally irrelevant when determining CERCLA liability. To the extent the district court relied upon an EPA designation in deciding whether to grant summary judgment, it committed error.

### 5. *Successor Liability*

Several decisions were made regarding the scope of successor liability. In the case of one appellee, it was found that although the successor continued its predecessor's business "using its former assets, employees and customers," summary judgment in favor of that appellee on liability was proper. *Murtha III,* 840 F.Supp. at 185. In another instance, no successor liability was found even when "[a] prior sole proprietorship was conducted under a comparable name" and the predecessor "sold the business and related assets to [a successor]." *Id.* at 191. A third case was dismissed despite a successor's purchase of assets and continuation of the predecessor's business. *Id.* at 190.

The district court did not explicitly formulate a test for deciding when successor liability exists. *See Murtha III,* 840 F.Supp. at 185. And, although the question has been addressed in other circuits, we have yet to decide exactly what is required for successor liability under CERCLA, *see New York v. N. Storonske Cooperage Co.,* 174 B.R. 366, 374 (N.D.N.Y.1994) (recognizing that we have not decided this issue). We turn to this question now.

We consider first the Act's language, recognizing at the outset that the Act has no provision explicitly governing corporate successor liability. *See Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 91 (3d Cir.1988) ("CERCLA failed to address many important issues, including corporate successor liability."), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *see also United States v. Carolina Transformer Co.,* 978 F.2d 832, 837 (4th Cir.1992) (explaining that CERCLA is silent on this subject); *Louisiana–Pacific Corp. v. Asarco, Inc.,* 909 F.2d 1260, 1263 (9th Cir.1990) ("Congress has not addressed the issue of successor liability under CERCLA.").

Nonetheless, most courts have read CERCLA as making successor corporations liable, in certain circumstances, for their predecessors' acts. *Carolina Transformer,* 978 F.2d at 837; *Anspec Co. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1245 (6th Cir.1991); *Louisiana–Pacific,* 909 F.2d at 1263; *Smith Land,* 851 F.2d at 91–92; *N. Storonske,* 174 B.R. at 374; *In Re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,* 712 F.Supp. 1010, 1013 (D.Mass.1989) (following *Smith Land* ). *See United States v. Mexico Feed & Seed Co.,* 980 F.2d 478, 487 (8th Cir.1992) (successor corporations are "persons" liable under CERCLA).

■ In our view CERCLA imposes successor liability. The plain language of the Act imposes liability on any "person" who fits within the four categories of liable parties. 42 U.S.C. § 9607(a). "Person" is defined to include, *inter alia,* a "corporation, association, partnership, consortium, joint venture, [or] commercial entity." § 9601(21). Further, federal law provides a rule of construction that when the word "company" or "association" is used, it "embrace[s] the words 'successors and assigns of such company or association.'" 1 U.S.C. § 5; *see Anspec,* 922 F.2d at 1247 (applying § 5 in analyzing CERCLA liability). Thus, CERCLA's statutory language, properly read, provides for successor liability.

Moreover, the Act's broad remedial purpose would be sharply curtailed if the Act did not encompass successor liability. As the Third Circuit has observed, "[t]he concerns that have led to a corporation's common law liability ... for the torts of its predecessor are equally applicable to the assessment of responsibility for clean-up costs under CERCLA." *Smith Land,* 851 F.2d at 91. In other words, absent successor liability, a predecessor could benefit from the illegal disposal of hazardous substances and later evade responsibility for remediation simply by changing the form in which it does business, thereby subverting the Act's purpose of holding responsible parties liable for cleanup costs. *See Murtha I,* 958 F.2d at 1198. We will not read § 9607(a) in a manner that would defeat Congress' overall purpose, absent an express statement from the legislature that we do so. *See Shore Realty,* 759 F.2d at 1045.

A number of courts have recognized the importance of national uniformity and applied traditional rules of successor liability, rather than the successor liability law of a given state. *See Smith Land,* 851 F.2d at 92 (instructing district court to consider national uniformity in resolving successor liability issues under CERCLA); *see also Mexico Feed,* 980 F.2d at 487 n. 9 (upholding the application of federal law); *Louisiana–Pacific,* 909 F.2d at 1263 & n. 2 (deeming appropriate a federal rule that relies on traditional common law notions because of the need for national uniformity). *But see Anspec,* 922 F.2d at 1248 (applying successor liability law of forum state); *N. Storonske,* 174 B.R. at 375 (applying a mixture of state and traditional norms). The traditional common law rule states that a corporation acquiring the assets of another corporation only takes on its liabilities if any of the following apply: the successor expressly or impliedly agrees to assume them; the transaction may be viewed as a *de facto* merger or consolidation; the successor is a "mere continuation" of the predecessor; or the transaction is fraudulent. *Carolina Transformer,* 978 F.2d at 838; *see also Mexico Feed,* 980 F.2d at 487; *Louisiana–Pacific,* 909 F.2d at 1263. Both sides agree that this is the standard.

The coalitions contend that when determining whether there is a "mere continuation," we should not use the common law test (sometimes referred to as the identity test), which requires the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations. *See Carolina Transformer,* 978 F.2d at 838 (explaining traditional rule). Rather, they urge that we employ the "continuity of enterprise" approach, also called the "substantial continuity" rule. The Supreme Court has followed this approach in the labor law context by asking if the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers. *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987); *see also Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 175 (5th Cir.1985) (using a slightly different version of substantial continuity test).

CERCLA is entitled to a construction that advances its primary goals. Because the substantial continuity test is more consistent with the Act's goals, it is superior to the older and more inflexible "identity" rule, *see Carolina Transformer,* 978 F.2d at 838, 840 (endorsing this approach); *see also Mexico Feed,* 980 F.2d at 487–89 (same); *United States v. Western Processing Co.,* 751 F.Supp. 902, 905 (W.D.Wash.1990) (looking to continuing business test). *But see Sylvester Bros. Dev. Co. v. Burlington Northern R.R.,* 772 F.Supp. 443, 447–49 (D.Minn.1990) (declining to apply the "continuing business enterprise" test). We therefore adopt the substantial continuity test as the appropriate legal test for successor liability under CERCLA. *Cf. Schiavone,* 79 F.3d at 255 (recognizing direct operator liability because it is compatible with statutory language and consistent with CERCLA's remedial scheme).

The district court spent little time exploring this question. It noted the coalitions' citation to *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873, 883

(1976), an early case defining the "continuity of the enterprise" or substantial continuity approach, yet refused to impose successor liability without "convincing authority." *Murtha III*, 840 F.Supp. at 185. Because an approach quite similar to that used in *Turner* is the one we follow in determining successor liability, we must reverse those grants of summary judgment where the district court applied a different and more restrictive law of successor liability.

### 6. *Transporter Site–Selection*

Summary judgment also was granted to several alleged transporters of hazardous substances for various reasons, including those we have already discussed. An additional reason was offered for the decision concerning the transporters—they were held not liable because "they were directed to the sites or transfer stations by others." *Id.* Hence, we must address the legal question of whether site-selection is a required element for transporter liability.

The Act imposes liability on

any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance

42 U.S.C. § 9607(a)(4). This awkwardly worded provision requires that we decide whether "selected by such person" modifies the entire phrase "disposal or treatment facilities, incineration vessels or sites" or only the immediately antecedent word "sites." If the latter reading is correct, there is no basis for imposing a site-selection requirement for transporter liability where the substances were, as here, disposed of at a disposal or treatment facility.

The appellants offer two principal arguments in support of this reading. First, they point out that the Act elsewhere defines a facility as "any site ... where a hazardous substance has been deposited, stored, disposed of, or placed." 42 U.S.C. § 9601(9). They aver that reading the "selected by such person" language to apply only to sites other than those where hazardous substances have

been deposited, stored, disposed of, or placed, is therefore necessary to prevent the word "sites" from being redundant. *See, e.g., Bailey v. United States*, —— U.S. ——, ——, 116 S.Ct. 501, 507, 133 L.Ed.2d 472 (1995) (construing statute to avoid making words redundant). Second, they urge that we keep in mind the Act's legislative purpose of making all who profit from pollution pay for their conduct.

Recently, a sister Circuit concluded that CERCLA includes a site-selection requirement for transporters. *Tippins Inc. v. USX Corp.*, 37 F.3d 87, 94 (3d Cir.1994). While noting the canon of statutory construction that "absent a clear intention to the contrary, a modifier's reference is to the closest noun," *id.* at 93, the court recognized that this canon need not be followed in all instances. *Id.*; *see also Nobelman v. American Sav. Bank*, 508 U.S. 324, 330–31, 113 S.Ct. 2106, 2110–11, 124 L.Ed.2d 228 (1993) (reliance on the "rule of the last antecedent" is not "compelled"). Here, following the canon and adopting the appellants' rule would create an odd paradox: A transporter who brought hazardous substances to a disposal facility would be strictly liable, while a transporter who brought hazardous substances to some site other than a facility would not be liable unless the transporter itself selected the site. *Tippins*, 37 F.3d at 93–94. Thus, the coalitions' reading, while "quite sensible as a matter of grammar," *Nobelman*, 508 U.S. at 330, 113 S.Ct. at 2111, would "lead to a curious result." *Tippins*, 37 F.3d at 93.

The Third Circuit's conclusion is consistent with most other courts that have considered the subject. *See id.* (collecting cases); *see also United States v. Hardage*, 985 F.2d 1427, 1435 (10th Cir.1993) (requiring site selection for transporter liability); *United States v. Petersen Sand & Gravel, Inc.*, 806 F.Supp. 1346, 1356 (N.D.Ill.1992) (same); *Alcatel Info. Sys. v. Arizona*, 778 F.Supp. 1092, 1096 (D.Ariz.1991) (same); *United States v. Western Processing Co.*, 756 F.Supp. 1416, 1420 (W.D.Wash.1991) (same). *But see Prisco v. New York*, 902 F.Supp. 374, 388 (S.D.N.Y.1995) (stating test for transporter liability without noting a site selection requirement); *Jersey City Redevelopment*

*Auth. v. PPG Indus.*, No. CIV.A. 85–2014, 1987 WL 54410, at *5 (D.N.J. Sept. 3, 1987) (finding that "selected by the transporter" modifies only "sites"), *aff'd without written opinion*, 866 F.2d 1410, 1411 (3d Cir.1988).

We are persuaded by the reasoning of *Tippins* and hold that only transporters who select the disposal location are liable under CERCLA. As a consequence, we agree with the district court that unless the transporters selected the facility or disposal site, they cannot be found liable under the Act. However, the meaning of the word "selected" is hardly clear. *Tippins*, 37 F.3d at 94, determined that a transporter is properly liable under the Act when it ultimately selects the disposal facility or when its active participation in the decision amounted to "substantial input into which facility was ultimately chosen."

This view accords with the Act's language and purpose. First, a transporter can be said to select a facility or site when it helps the generator choose a disposal facility by recommending a facility or set of facilities. Second, a transporter who plays an active role in choosing the disposal facility is obviously more culpable and responsible for the resultant harm than a transporter who simply does the bidding of a given generator; the latter has a more attenuated connection to the harm. An "active participation" standard recognizes the often significant role played by transporters in choosing the disposal site. Hence, in cases of transporter liability, we must vacate the grants of summary judgment and remand for further consideration in light of the above discussion.

## II Procedural Issues

We address next appellants' procedural arguments that are common to a great many of the cases before us.

### A. *Summary Judgment Standard*

We have recognized in CERCLA's context that summary judgment is a "powerful legal tool[ ]" that can "avoid lengthy and perhaps needless litigation." *Alcan*, 990 F.2d at 720. This tool is one well adapted to encouraging settlement and speeding remedi-

ation. *See In Re Cuyahoga Equip. Corp.*, 980 F.2d at 119 (CERCLA designed to encourage settlement to reduce litigation costs). Its utility in CERCLA litigation is not a license to use it when material facts are genuinely disputed. Just as there is no heightened pleading standard in CERCLA cases, *see Warwick Admin. Group v. Avon Prods., Inc.*, 820 F.Supp. 116, 121 (S.D.N.Y. 1993); *cf. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (heightened pleading requirement exists only in cases involving fraud or mistake), the showing required to survive summary judgment also remains the same.

We now briefly describe the standard for summary judgment under Fed.R.Civ.P. 56. A party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). When a court is confronted with facts that permit several different conclusions, all inferences from the underlying facts must be drawn in the nonmovant's favor. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995). The trial court must bear in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

If the movant demonstrates an absence of material issues of fact, a limited burden of production shifts to the non-movant, which must "demonstrate more than 'some metaphysical doubt as to the material facts, ... [and] must come forward with "specific facts showing that there is a genuine issue for trial." ' " *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (citations and emphasis omitted). Summary judgment, then is granted only when "there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986), or, in other words, only if "no rational jury could find in

favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). The trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.*

### B. Sua Sponte *Summary Judgment*

The district court granted summary judgment *sua sponte* in a number of cases. A *sua sponte* grant of summary judgment may be appropriate so long as the losing party was notified prior to its grant and given the opportunity to produce whatever proof it has in opposition. *Celotex*, 477 U.S. at 326, 106 S.Ct. at 2554; *see also FLLI Moretti Cereali S.P.A. v. Continental Grain Co.*, 563 F.2d 563, 565 (2d Cir.1977) (power to grant summary judgment *sua sponte* "must be exercised with great caution and with care taken to give the parties an opportunity to present materials in opposition"). To ensure the parties have notice and an opportunity to be heard, we have established a policy of adhering closely to the ten day notice period specified by Rule 56(c). *See Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 945 F.2d 53, 55 (2d Cir.1991) (per curiam).

Notice furthers two important interests. First, it gives the losing party an opportunity to develop the record to demonstrate that genuine material issues are in dispute or that determinative legal questions should be resolved in its favor, and thereby prevents the losing party from suffering procedural prejudice. Second, the parties' development of a complete record facilitates *de novo* appellate review. *See Hispanics For Fair and Equitable Reapportionment (H–FERA) v. Griffin*, 958 F.2d 24, 25 (2d Cir.1992) (per curiam). When the non-moving party asserts that it cannot adequately respond to its opponent's motion for summary judgment in fewer than ten days, it should be given the full ten days unless there is good reason to believe that the assertion is a sham. *See Gutwein v. Roche Labs.*, 739 F.2d 93, 96 (2d Cir.1984). Here, the coalitions insist they

were denied notice and an opportunity to be heard before the district court granted summary judgment *sua sponte* against them in a number of cases.

Our review of the underlying procedural history indicates that such was the case. On December 20, 1993, the trial court ordered the coalitions to file a list of third parties that the coalitions intended to pursue. *Murtha III,* 840 F.Supp. at 191. Although it directed the coalitions to "be sure that [its prior] rulings . . . are fully considered and accommodated," *id.*, this is too vague an admonition to be deemed equivalent to notice. When the coalitions asked for additional time, their request was denied and the prior order was reaffirmed. Three weeks later, on January 10, 1994, the coalitions were again ordered to review their files and "list" those third party claims each intends to pursue as valid. The district court further explained that "[a]ny third party claim not so listed by January 21, 1994, will be dismissed as not intended to be prosecuted further."

The district court acknowledged—in an order dated February 5, 1994—that appellants eventually prepared and presented such lists but, rather than simply dismissing those claims the coalitions did not intend to pursue, the district court dismissed a great many others *sua sponte*. In a case involving some 3000 filings, the coalitions were no doubt dedicating most of their effort between December 20, 1993 and February 5, 1994 to sifting through their records and compiling the list requested by the trial court. The coalitions were not asked to produce supporting papers or legal arguments to undergird their liability claims—they were only directed to submit a list within 11 days of the January 10 order. It is hardly surprising that the coalitions simply submitted the lists and did little else.

A more prudent course for the district court would have been to give the coalitions ten days' notice to show good cause why summary judgment should not be granted against them. Such a course also would have given the district court the benefit of the arguments and evidence of both sides and would have provided a more complete record on appeal. *See Herzog & Straus v.*

*GRT Corp.*, 553 F.2d 789, 792 & n. 5 (2d Cir.1977) (notice and opportunity to make arguments are vital to making an informed judgment); *cf. Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 65 (2d Cir.1988) (ruling erroneous a decision to grant motion to dismiss on ground neither raised nor briefed by parties). As the record currently stands, we have no knowledge of the precise reasons for the district court's decision to grant summary judgment *sua sponte* in those cases where it took that course of action. It said only that there was "want of substantiation," a truism that necessarily applies to all grants of summary judgment and which adds nothing to our understanding of the trial court's decision. Because the coalitions' claims are not demonstrably frivolous, the summary judgment dismissals, made *sua sponte* without ten days' notice, were error.

### C. Discovery Limitations

In the course of this litigation, the district court placed certain restrictions on discovery. For over one year—from March 6, 1991 until April 29, 1992—it did not allow discovery outside of that permitted by the uniform discovery orders. Showings of good cause for further discovery were not entertained until April 29, 1992, when the court solicited motions for summary judgment. Several weeks later, it promised the coalitions additional discovery for them to respond to the forthcoming summary judgment motions. The special master repeated the promise in August, but refused to authorize discovery until the motions for summary judgment were submitted and coordinated. In December, appellants were given 60 days within which to conduct limited deposition discovery. They contend that these discovery limitations were so severe as to be an abuse of the trial court's discretion and to constitute reversible error.

■ A trial court necessarily has wide discretion in managing pre-trial discovery, *see Cruden v. Bank of New York,* 957 F.2d 961, 972 (2d Cir.1992), and we will not disturb its orders absent a clear abuse of its discretion, *id.; Robertson v. National Basketball Ass'n,* 622 F.2d 34, 35–36 (2d Cir.

1980). Reversal of a judgment because of an improper order denying or curtailing discovery is "unusual." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2006, at 92 (2d ed. 1994).

■ We find no abuse of discretion in the district court's management of discovery. In complex multi-party litigation, a trial court often needs to use its broad authority to control discovery. Some of the measures adopted here, such as time limits, schedules for discovery, and limitations on deposition discovery, have been specifically recommended as acceptable options. *See Manual For Complex Litigation (Third)* § 21.422 (1995); H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 80 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2862 (supporting the enactment of amendments to CERCLA and urging district courts to "carefully manage" CERCLA cases "to insure that the litigation is conducted in an expeditious manner" through, *inter alia,* the "exercise of strict judicial control over multi-party proceedings . . . as well as use of the procedures set forth in the *Manual For Complex Litigation* ").

The district court sought to guard against what it thought might be a wildfire of unwarranted discovery, recognizing that unduly extensive use of discovery could make the litigation expense disproportionate to the cost of cleaning up the landfills. In order to have orderly and reasonable discovery, the trial judge required that a high standard of good cause be met before discovery beyond that provided in the uniform orders would be permitted. Its orders were tailored appropriately to meet this need.

Appellants also strongly challenge the denial of their requests for additional discovery under Fed.R.Civ.P. 56(f). Rule 56(f) allows a party faced with a motion for summary judgment to request additional discovery, and the Supreme Court has suggested that such a request be granted when "the nonmoving party has not had an opportunity to make full discovery." *Celotex,* 477 U.S. at 326, 106 S.Ct. at 2554. Here too we will reverse only if there was an abuse of discretion. *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994). Doubtless, more discov-

ery might have been helpful, but in a case this complex the information falling within the broad purview of federal discovery is almost without limit. In this light it is hard to fault the district court for placing limitations on discovery. Given the circumstances of this case, we see no abuse of discretion either in its discovery orders or its decision rejecting the appellants' Rule 56(f) motions.

### D. Expert Opinion

A final contested issue common to most of the claims involved in the instant case concerns the district court's evaluation of the scientific expert opinion of Dr. Kirk W. Brown, a Professor of Soil and Crop Sciences at Texas A & M University. The coalitions relied on Dr. Brown's affidavit as crucial evidence in opposing the appellees' summary judgment motions. Before discussing the district court's assessment of Dr. Brown's affidavit, a brief review of the contents of the affidavit is necessary.

### 1. Expert's Credentials and Methodology

Dr. Brown holds a masters degree from Cornell University and a doctorate in agronomy from the University of Nebraska. He has written more than 150 scholarly, scientific articles and a book dealing with the disposal and treatment of hazardous waste substances. His professional qualifications make him an expert witness, and the district court so found. See Murtha II, 815 F.Supp. at 543.

Dr. Brown submitted an affidavit in support of the coalitions' position that appellees were potentially responsible parties at both landfill sites. In preparing this sworn statement, he reviewed numerous reports including, most significantly, six reports relating to the Laurel Park landfill and three reports discussing the Beacon Heights landfill.[5] After examining these reports, the expert was of the opinion that "there [were] CERCLA hazardous substances present in each and every leachate sample from these landfills."

Dr. Brown did not personally visit the landfills or dig up any shovelfuls of waste, but he was not required to do so.

He studied EPA reports concerning municipal and industrial landfills in the United States and he set forth the types of hazardous substances found in waste streams generated by households, commercial establishments, institutions, and industries. He used these reports to generate lists of the wastes and CERCLA hazardous substances routinely discarded by typical households, commercial establishments, institutions, and industries during the time period relevant to this case. After comparing the concentrations of hazardous substances in the leachates from the two landfills with the concentrations generally found in municipal solid waste landfills in the United States, he concluded, in his expert opinion, that the waste streams disposed of in the two landfills were similar to the landfills he had studied and that they contained CERCLA hazardous substances.

Further, Dr. Brown read the statements that the various appellees made in their deposition testimony and read other documents relevant to the kind of waste disposed of by each appellee. His comments varied for each appellee. Based on the available information, he meticulously linked the types of wastes, including identification of specific products discarded by each defendant, with specific CERCLA hazardous substances. His analysis relied on a series of studies and reports that showed which known CERCLA hazardous substances are in specific waste products. This allowed him to correlate the specific wastes disposed of by each appellee to specific hazardous substances.

For example, when a party admitted to disposing of tire products, Dr. Brown explained which hazardous substances are found in normal tire products. Although he could not swear with absolute certainty that the tire products disposed by a specific appellee were similar to normal tire products, such absolute certainty is not required to

---

**5.** Some appellees claimed that Brown never studied the two landfills involved in this litigation or that he failed to investigate the landfill wastes. This is patently wrong. Particularly mendacious is the implicit claim by Manafort Brothers, E.

Eric Arsan Refuse, NRS Carting, and Zollo Drum that none of the studies used by Dr. Brown dealt with the relevant landfills. This contention is wholly contradicted by the record.

oppose successfully a summary judgment motion; rather, at the summary judgment stage, the trial judge must decide only whether a reasonable jury could find liability by a preponderance of the evidence. Further, when the appellees failed to submit any evidence to distinguish the products of which they disposed from those addressed by Dr. Brown in his affidavit, Dr. Brown's probabilistic evidence stands largely uncontradicted. Moreover, each and every type of product disposed of need not contain hazardous substances. Any amount of such substances is sufficient to create liability.

### 2. Admissibility of Brown Affidavit

Although the district court agreed that Dr. Brown was an expert, and that his evidence could be admissible against certain parties, it apparently did not place much weight on the affidavit. It ruled that the expert's sworn statement was not controlling for non-municipal generators, *id.* at 544, and that it could not be applied to the municipal generators because no adequate foundation for its acceptance had been laid. *Murtha III*, 840 F.Supp. at 189. More specifically, the district court added, Dr. Brown's "references to facts, without specification, in various documents relied on, are insufficient to make his opinions relevant." *Id.* It therefore rejected the affidavit as lacking "probative merit" because it did not rely on "direct evidence." *Id.* at 184. In addition, the court expressly weighed the affidavit against the backdrop of the EPA Municipal Policy, according to which the EPA made certain enforcement decisions. *Id.* at 188.

■■■■■■ Our view of this affidavit and its probative worth differs dramatically from that of the district court. This is partly because it is difficult for us to imagine an expert with more experience and knowledge in the hazardous substances field than Dr. Brown, and partly because we find his affidavit to be carefully researched, detailed, and directly relevant to this case. As will become clear when we consider each appellee's case individually, we think the trial court assessed the weight of conflicting proof, in effect substituting its judgment for that of the jury. *See In Re Joint Eastern & South-*

*ern Dist. Asbestos Litig.*, 52 F.3d 1124, 1133 (2d Cir.1995) (applying the rule prohibiting such a practice). Environmental science, like epidemiology, "is ill-suited to lead a factfinder toward definitive answers, dealing as it does in statistical probabilities." *Id.* Here there was only one expert opinion before the court, and the court was obliged not to ignore it. Because Dr. Brown reviewed nine studies concerning the subject landfills, his affidavit was laid on a proper foundation.

■■■■■■ When deciding a motion for summary judgment, only admissible evidence may be considered. *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir.1993). Where scientific knowledge will assist a trier of fact to determine an issue of fact, an expert witness "may testify . . . in the form of an opinion or otherwise." Fed.R.Evid. 702. Summary evidence is admissible when the underlying documents are admissible and are made available to the adverse party. *Tamarin*, 13 F.3d at 53. Here, where the reports used by Dr. Brown are of the sort ordinarily relied on by experts in forming opinions within their field of expertise, the reports need not be admissible at trial, *see* Fed.R.Evid. 703, and need not actually be attached to the affidavit to satisfy Fed. R.Civ.P. 56(e). *See Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994). An expert's testimony, in order to be admissible under Rule 705, need not detail all the facts and data underlying his opinion in order to present that opinion. *See* Fed. R.Evid. 705; *Ambrosini v. Labarraque*, 966 F.2d 1464, 1469 (D.C.Cir.1992). At any rate, the Brown affidavit does provide the specific facts required by Rule 56(e), *see id.* at 1470, when he explains which specific hazardous substances are found in each waste disposed of by each appellee.

■■■■■■ Nor is the Brown affidavit "junk science" of the sort that should be rejected under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Dr. Brown relied on the methodology and data typically used and accepted in these sorts of cases, *see Iacobelli*, 32 F.3d at 25, and his testimony would therefore be admissible under *Daubert*, 509 U.S. at 592–95, 113 S.Ct. at 2796–98. Moreover, if

the appellees honestly believe this scientific evidence is weak, they should cross-examine him vigorously at trial and present contrary evidence to refute his findings and conclusions. *Id.* at 596, 113 S.Ct. at 2798. This is the traditional and appropriate means of attacking admissible evidence with which one disagrees. *Id.* In addition, given that CERCLA hazardous substances are listed at 40 C.F.R. § 302.4, Table 302.4, we cannot agree that because the Brown affidavit stated whether a given hazardous substance was one listed by CERCLA, it therefore improperly drew a legal conclusion. *See United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint,* 34 F.3d 91, 96 (2d Cir.1994) ("[E]xperts are not permitted to present testimony in the form of legal conclusions.").

The cases appellees cite in opposition are unpersuasive. For instance, *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1338–39 (7th Cir.1989), involved a seven-sentence-long expert affidavit devoid of factual references or reasoning. By contrast, Dr. Brown's affidavit is 141 pages long, every conclusion in it is drawn with reference to specific facts or explanations. It explains precisely what was reviewed and the general bases for his opinion.

The district court also incorrectly compared the affidavit with the "second-hand and factually sparse" affidavit involved in *Chandler v. Coughlin,* 763 F.2d 110, 113 (2d Cir.1985). *See Murtha III,* 840 F.Supp. at 189. Dr. Brown's extensive use of reports from the relevant facilities, the information found in discovery materials, and past scientific studies make his expert opinion highly probative. Dr. Brown relied in part on the information provided by the appellees, and he considered what sorts of hazardous substances are ordinarily found in the specific kinds of waste disposed of by the appellees. This is a permissible approach for an expert witness in a case such as this. An examination of the Brown affidavit's detail demonstrates that the affidavit was thorough and well-supported, unlike the affidavit in *Chandler,* which was only a few paragraphs long.

Again, were the Brown affidavit the kind of evidence insufficient for a case to survive summary judgment under CERCLA, the Act's scope would be sharply limited. People and companies often dispose of waste without knowing its contents. In future lawsuits, once hazardous substances were discovered in a given facility, the generators would only need say that they could not recall what was in their waste. Because plaintiffs usually lack direct evidence that a defendant dumped hazardous substances, the potentially responsible parties would only be found liable in those rare instances in which a so-called "smoking gun" is discovered, *cf. Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) ("smoking guns" rarely found in litigation), and the broad, remedial purpose of the Act would thereby be defeated.

Of course, a CERCLA plaintiff is not required to prove its case with scientific certainty; a preponderance of the evidence is enough. *Cf. Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 3008–09, 92 L.Ed.2d 315 (1986) (per curiam) (Brennan, J., concurring) (discussing Title VII cases). While certainty is an ideal pursued by scientists and courts alike, it is not always a realistic goal in environmental science, where certainty can be elusive. *See Ethyl Corp. v. EPA,* 541 F.2d 1, 25 & n. 52 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 2663, 49 L.Ed.2d 394 (1976).

Although we find Dr. Brown's affidavit highly probative, it is not dispositive of the issues at bar. Defendants may of course produce proof showing why their waste—tire products, for example—did not include the hazardous substances ordinarily found in tire products. It is up to the factfinder ultimately to determine whether Dr. Brown's opinion together with other evidence presented by the coalitions is sufficient to establish appellees' liability.

Because disputed factual issues exist, summary judgment—which the appellants request—may not be granted in their favor either. Expert testimony was essential in this complex environmental litigation to help comprehend scientific data and determine whether the chemicals covered by CERCLA as hazardous substances were con-

tained in appellees' waste. It was error to reject Dr. Brown's written testimony that the wastes did contain such substances, particularly in the absence of any expert evidence to the contrary. The affidavit raised genuine issues of material fact in most of the cases before us, and therefore the grants of summary judgment in such cases were improper.

### III Case–By–Case Review

We pass to a review of 85 cases on an individual basis. Our review of the district court's decisions granting summary judgment is *de novo*. *E.g., Randell v. United States,* 64 F.3d 101, 106 (2d Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 65, 136 L.Ed.2d 26 (1996). Because their disposition is duplicative of much of our earlier discussion, we have placed this review in the Appendix at the end of this opinion. The Appendix contains a brief discussion of the district court's ruling, found generally in *Murtha III,* 840 F.Supp. at 183–91. In each case, unless otherwise indicated, we reverse and remand the case to the district court.

### IV The Governments' Response Costs Claims

We turn next to the government's litigation to recover response costs. The United States and Connecticut (collectively, the governments) both appeal the district court's decisions concerning their lawsuits against several non-settling potentially responsible parties for unreimbursed response costs. *Murtha IV,* 855 F.Supp. at 546. We deal initially with the claim raised by the United States (U.S.), and we then consider briefly that of the State of Connecticut (State).

The U.S. makes two principal claims of error. First, it contends that the district court improperly considered the $1.975 million received by the Laurel Park Coalition under the Murtha consent decree as funds received by the government. Second, the U.S. asserts that judgment on the pleadings was inappropriate because the cost summaries it submitted to the district court showed unreimbursed response costs. Before we examine these specific contentions, we begin with a review of the relevant CERCLA law.

### A. *Governing CERCLA Law*

The Act addresses the treatment of both settling and non-settling defendants:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9613(f)(2). In short, the Act provides that when, as here, a settlement addresses past and future costs, the non-settling defendants' liability to the government for those costs is reduced by the amount of the settlement. However, the non-settling defendants will still be held accountable for the remainder of the government's response costs, and that liability will be reduced only by the amount of the settlement rather than by the pro rata share attributable to the settling parties. In other words, non-settling defendants may bear disproportionate liability for their acts. *See United Technologies Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96, 103 (1st Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). Further, as a means of encouraging settlements, only settling parties are guaranteed not to be liable for future contributions regarding the subjects addressed in the settlement.

As such, § 9613(f)(2) strengthens the federal policy of encouraging CERCLA settlements. Elsewhere the Act specifically asks that the government enter into CERCLA settlements "in order to expedite effective remedial actions and minimize litigation." § 9622(a). Courts considering CERCLA cases have recognized that the usual federal policy favoring settlements is even stronger in the CERCLA context. *See City of New York v. Exxon Corp.,* 697 F.Supp. 677, 692– 93 (S.D.N.Y.1988); *see also United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 84 (1st Cir.1990).

Responsible parties are liable for "any ... necessary costs of response in-

curred [that are] consistent with the national contingency plan." § 9607(a)(4)(B). The Act also states that "[t]he terms 'respond' or 'response' mean[ ] remove, removal, remedy, and remedial action," and these terms include "enforcement activities related thereto." § 9601(25). Thus, the government's recoverable response costs properly include not only the obvious costs of remediation, but also include, *inter alia*, attorneys' fees,[6] *United States v. Gurley*, 43 F.3d 1188, 1199–1200 (8th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 73, 133 L.Ed.2d 33 (1995), indirect administrative costs, *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1504 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990), studies conducted for remediation, *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 618 (S.D.N.Y.1986), and even prejudgment interest, § 9607(a). The response costs' consistency with the national contingency plan is presumed; the defendant bears the burden of proving inconsistency, and it must show "that the EPA acted arbitrarily and capriciously in choosing a particular response action." *United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir.1992), *cert. denied*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *R.W. Meyer*, 889 F.2d at 1508. With this legal background in mind, we consider the government's contentions.

## B. *District Court Decision*

As discussed earlier, the Beacon Heights Coalition and the U.S. agreed that the Beacon Heights Coalition would pay for the remediation at the Beacon Heights landfill and would pay the government for its future non-remediation response costs in excess of $500,000. The Laurel Park Coalition agreed to conduct subsequent remediation at Laurel Park and to pay for the U.S.'s future oversight costs in excess of $200,000. Murtha paid $5,375,000 to discharge its owner and operator liability at both landfills. The Murtha settlement proceeds were divided among

several parties: $1,875,000 went to the Beacon Heights Coalition and $322,500 to the government for Beacon Heights response costs. At Laurel Park, the U.S. and the State were each repaid $625,000 for past response costs. The remaining $1,975,000, initially placed in a registry account with the district court, was used for Laurel Park remediation by the Laurel Park Coalition. Had that coalition not formed within 18 months, the governments would have received the money for remediation at Laurel Park. However, when the coalition was formed, the precondition was met, and the money moved directly from the registry account to the Laurel Park Coalition.

Several non-settling parties claimed that all response costs incurred by both the U.S. and the State were covered by the Murtha settlement and the settlements with the two coalitions, accordingly those non-settling parties moved for judgment on the pleadings. The district court agreed, finding that the entire amount of the Murtha consent decree ($5.375 million) minus the amount paid to the Beacon Heights Coalition ($1.875 million) had to be credited against any unreimbursed past costs of the U.S. and Connecticut. *Murtha IV*, 855 F.Supp. at 546. By so holding, the district court credited the $1.975 million set aside for Laurel Park cleanup, and later given to the Laurel Park Coalition, against the governments' response costs.

The district court stated that "[n]either EPA nor DEP present[ed] figures for incurred response costs not covered by the net Murtha settlement" of $3.5 million ($5.375 million minus the $1.875 million given to the Beacon Heights Coalition). *Id.* Holding that § 9613(f)(2) required that the non-settling defendants be credited with the full amount of the settlement (instead of reducing the government's unreimbursed costs by only the amounts it actually received), *id.* at 547, the trial court found that this amount, along with funds received from the coalitions, totally wiped out all response costs incurred by

---

6. The appellees contend that *Key Tronic Corp. v. United States*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), forecloses any claim by the government that enforcement costs can include attorneys' fees. We disagree. *Key Tronic* denied private parties the right to recovery attorneys'

fees in a suit for contribution brought against the United States. The Court specifically "offer[ed] no comment on the extent to which th[e] phrase ["enforcement activities"] forms the basis for the Government's recovery of attorney's fees through § [9607]." *Id.* at ——, 114 S.Ct. at 1967.

the U.S. and the State. It therefore granted judgment on the pleadings.

On the government's and the State's response costs appeal, Armstrong Rubber Company, The Eastern Company, Kerite Company, Primerica, Inc., and George Clark are Beacon Heights appellees, and Atlantic Richfield Company, The Eastern Company, and Gerald Metals, Inc. are Laurel Park appellees.

## C. *Judgment on the Pleadings Reversed*

■ The government contends first that the district court improperly included the $1.975 million that Murtha agreed to pay for Laurel Park remediation as funds received by the government. We agree with the government for several reasons. In our view, the government had neither possession nor actual control over the $1.975 million given to the Laurel Park Coalition. All parties agree that this portion of the money from the Murtha decree was deposited in a court registry account. It was then released to that coalition upon its formation. The district court took a contrary position, holding that the governments "had control and thus constructive possession of the settlement." *Murtha IV*, 855 F.Supp. at 547. Similarly, appellees contend that because the United States did not have to enter into an agreement with an industrial coalition for the clean-up of Laurel Park, the government effectively controlled the $1.975 million. However, because the Laurel Park Coalition's consent decree (forming the Laurel Park Coalition) was entered by the court one day after the Murtha consent decree was entered, the contingency required for the government to receive the Laurel Park funds—non-formation of the coalition—never occurred.

We decline to adopt the district court's expansive understanding of "possession." Just as the district court did not credit the government or the State with receipt of the $1.875 million that the Murtha settlement allocated to the Beacon Heights Coalition, it should not have credited the government with receipt of the $1.975 million allocated under the terms of the Murtha settlement to the Laurel Park Coalition.

But even if we accepted the district court's "constructive possession" theory, we would still conclude that the district court failed to consider that this money was spent for remediation at the Laurel Park landfill. Hence, if the $1.975 million had been received by the government, it would follow that the government should then immediately have been credited for spending the money for remediation at Laurel Park—the money would have been part of the incurred response costs. The government recognizes that "[t]he sums cancel each other out," and no one disputes that the money was ultimately used for future response costs at Laurel Park. The appellees may be correct that this arrangement does not qualify as a mixed-funding reimbursement under § 9622(b)(1), but that does not make the arrangement impermissible under CERCLA, a broad remedial statute designed to promote settlements.

The settlements forged by the government furthered important interests advanced by CERCLA: multi-party settlements and quick remediation. By agreeing to the Murtha settlement, in which Murtha set aside $1.975 million for the Laurel Park Coalition for oversight costs, the government encouraged the formation of that coalition, which will now undertake remediation. This is precisely the sort of creative settlement that the government and private parties should endeavor to craft in the future. In sum, the district court should not have reduced the non-settling defendants' liability to the government by the $1.975 million paid by Murtha to the Laurel Park Coalition under the Murtha consent agreement.

We also agree with the governments that unreimbursed response costs at both facilities still may remain, and that judgment on the pleadings was therefore inappropriate. Judgment on the pleadings, pursuant to Fed. R.Civ.P. 12(c), may only be granted when the pleadings show that it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Hence, if the cost summaries submitted by the U.S. and the State support the

relief sought, judgment on the pleadings was inappropriate. The government contends that the district court treated this motion as a summary judgment motion under Rule 56 without giving the government notice of its intention to do such. If this is what the district court did, it was error. *See Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988). However, because we believe the district court incorrectly interpreted the Act, we need not address this point.

■ The government submitted cost summaries on June 10, 1993 for both landfill sites. For Beacon Heights, the U.S. claimed that even though it had collected $356,508.06 from the Murtha consent decree, $2,855,334.35 remained as total outstanding costs. At Laurel Park, the U.S. collected $690,906.92 from the Murtha consent decree and $500,000.00 from the coalition for past costs, leaving the U.S. with $2,187,109.01 in outstanding costs. These cost summaries are supported by affidavits and other documentation. Based on its submissions, the government could prove facts entitling it to relief.

It is true that the coalitions will be paying most of the government's future costs. The Laurel Park Coalition will pay oversight costs in excess of $200,000, and the Beacon Heights Coalition will pay oversight costs in excess of $500,000. The Beacon Heights appellees claim that because the government incurred $1.1 million in response costs before the Beacon Heights Coalition's consent decree and because the Beacon Heights Coalition will pay for all oversight costs over $500,000, the government's costs are effectively "capped" at $1.6 million. The Laurel Park appellees make a similar argument regarding the government's response costs at that coalition's landfill site, declaring they are capped at $4.5 million ($4.3 million spent by the U.S. before the Laurel Park Coalition's consent decree and $200,000 not paid by that coalition). But the government's costs are not limited to the oversight costs (which the coalitions have agreed to repay). The non-settling defendants might still be liable for other enforcement costs, such as attorneys' fees and prejudgment interest.

■ Further, even if future response costs are somewhat speculative, the govern-

ment is still entitled to declaratory relief under CERCLA. *See Kelley v. E.I. DuPont de Nemours & Co.,* 17 F.3d 836, 844–45 (6th Cir.1994). As the entry of a declaratory judgment of liability for future costs is mandatory under the Act, the government should (if ultimately successful on remand) be granted declaratory relief in this action despite its failure properly to preserve this issue for appeal. *See United States v. Restrepo,* 986 F.2d 1462, 1463 (2d Cir.) (explaining that where an issue was not properly preserved, appellate court may grant relief were such relief would be available in an independent action), *cert. denied,* 510 U.S. 843, 114 S.Ct. 130, 126 L.Ed.2d 94 (1993).

The Beacon Heights appellees also contend that the provision in § 9613(f)(2) that non-settling defendants should have their liability reduced by "the amount of the settlement" refers to the total amount of money provided to all parties in a settlement. As a consequence, they maintain, because the Murtha settlement did not just provide money to the government for Beacon Heights remediation but also allotted $1.875 million to the Beacon Heights Coalition, this $1.875 million should also be counted when reducing the non-settlors' liability. However, the district court never questioned that the $1.875 million given to the Beacon Heights Coalition should not be counted against the government. The U.S. correctly explains that the appellees' theory would lead to absurd results. Consider the following hypothetical: The government and a state settle their claims with a landfill owner for $2 million, with each receiving $1 million. Each government has spent $2 million in response costs. Under the appellees' theory, even though the federal government only received $1 million, its recoverable response costs would be reduced by $2 million and therefore erased. This is too preposterous to be maintained.

Finally, we believe that the disputes in this case over the accounting techniques used by the government raise fact questions inappropriate for determination on a motion for judgment on the pleadings. The government has met the limited showing required to avoid judgment on the pleadings.

### D. *State of Connecticut's Claim*

Connecticut's claims on this appeal arise exclusively out of the Laurel Park landfill site. The State asserts it has incurred a total of $2,546,224.02 in response costs, including the costs for the installation of a water system and a new sewerline, as well as investigation expenses. The State contends that after it received funds from the Laurel Park Coalition's consent decree and the Murtha decree, $760,125.00 of unreimbursed response costs remained. As explained above, the district court incorrectly credited to the State a portion of the Murtha settlement that was paid to the Laurel Park Coalition. *See Murtha IV*, 855 F.Supp. at 547. Therefore, decision entering judgment against the State must also be reversed.

### V Summary Judgments Against United States

The government sued John and Joseph Betkoski, owners of the Beacon Heights facility until 1970 (when Murtha purchased the facility) and Richard Zollo, an alleged transporter of hazardous substances to the same landfill. All three were granted summary judgment by the district court, which concluded that the government failed to show the existence of a genuine issue of material fact as to their liability.

In the case of Richard Zollo, we again note that *sua sponte* summary judgment should generally only be granted after the losing party is given notice and an opportunity to present evidence and arguments in opposition. In any event, here the evidence before the court was sufficient for the government to survive summary judgment. The government submitted an affidavit that summarized certain EPA records concerning Zollo's disposal of waste at Beacon Heights. It also presented a letter from a waste generator serviced by Zollo that listed the chemicals present in its waste. This letter and other documents showed that Zollo transported to the landfill various materials (such as waste oil, waste chemicals, liquid paint, heavy sludges, paint residue, and latex dip scrap material) containing hazardous substances. And, Zollo admitted in an interrogatory submitted to the EPA he had transported waste

from several companies to Beacon Heights. These papers raised a genuine issue of material fact, and summary judgment was therefore inappropriate.

We also conclude that the district court should not have granted summary judgment to the Betkoskis. If genuinely disputed material facts remain concerning whether Zollo transported hazardous substances to Beacon Heights, it is hard to see how the Betkoskis can obtain summary judgment. They owned the Beacon Heights landfill during the time when Zollo allegedly transported chemical wastes to the site, and would therefore be directly liable under the Act. Moreover, the Betkoskis did not show the absence of disputed material facts and therefore failed to carry their burden at this stage of the litigation. Joseph Betkoski only claimed that he "never disposed of any waste" at the site and John Betkoski simply stated that he had no knowledge that any hazardous waste was disposed at Beacon Heights. However, the Betkoskis' liability turns on neither their disposal, nor their knowledge of any disposal of hazardous substances at the landfill; it depends solely on their ownership at a time when hazardous substances were deposited at the landfill.

Because we hold that summary judgment was inappropriate, the rulings against the United States and in favor of the Betkoskis and Richard Zollo must be reversed and those cases must be remanded.

### CONCLUSION

Accordingly, as indicated, we affirm the judgment appealed from in part, and reverse the judgment, in part, and remand to the district court to conduct further proceedings consistent with this opinion.

### APPENDIX

#### Case–By–Case Review

Review of the grant of summary judgment in 85 cases.

##### A. *Successor Liability Cases*

Earlier we explained the proper test for successor liability under CERCLA. As the

district court relied on a different test, we must vacate all grants of summary judgment premised on the absence of successor liability. On remand, the district court should reconsider its decisions in light of today's opinion. Should any material facts remain genuinely disputed, summary judgment should not be granted.

*Laurel Park and Beacon Heights Combined Claims:*

• Jacob Brothers, Inc.: The district court found that the currently constituted Jacob Brothers, Inc. did not assume the CERCLA liability of a previously formed corporation with the same name. Specifically, in 1925 a corporation named Jacob Brothers, Inc. was formed. This company later became known as Brothers Scrap, Inc. In 1987 a different company, Michael Schiavone & Sons, purchased some of the assets of the original "Jacob Brothers, Inc." The acquiring company then assigned its rights and duties under the acquisition to a newly formed corporation, "Connecticut Iron and Metal, Inc.," which later assumed the name "Jacob Brothers, Inc." Apparently there is a factual dispute over whether this appellee purchased a portion of the former Jacob Brothers' assets or substantially all of its assets. On remand the district court should decide whether, in light of our opinion, there is a genuine material fact in dispute.

• Seymour Brass, Inc.: This appellee, which purchased the "assets and business" of The Seymour Brass Turning Company, was granted summary judgment based on the absence of successor liability.

*Beacon Heights Only:*

• Connecticut Pharmacare, Inc. d/b/a/ Ford Pharmacy and Medical Supply: This business acknowledged disposal of general rubbish, including empty boxes, packing materials, empty or broken bottles of cleansers and prescription medicines, empty containers and paper. The president of the corporation denied sending hazardous substances to the Beacon Heights landfill "with the possible exception of such trace substances ... alleged to be included in general rubbish."

Dr. Brown concluded that several hazardous substances were found in the appellee's waste that were also found in both landfills.

The district court ruled against the Beacon Heights Coalition rejecting the proof in the Brown affidavit and ruling that trace amounts of hazardous substances were insufficient to create CERCLA liability. It also rejected the coalition's argument concerning successor liability under CERCLA. We reverse and remand on all three grounds.

• NRS Carting Co., Inc.: The district court granted summary judgment on the question of successor liability. NRS's contention that it was not a successor to Norwalk Refuse Service (Norwalk), but only purchased some commercial customer routes, equipment, and containers from Norwalk, presents a fact question regarding successor liability.

• Zollo Drum Company, Inc. (ZDC): The district court granted summary judgment to ZDC (a corporation run by Anthony Zollo) and rejected the Beacon Heights Coalition's argument that ZDC should be liable for the acts of a prior sole proprietorship operated by Richard Zollo (Anthony's father) which was later sold to ZDC.

### B. Transporter Liability Cases

The district court rejected the Beacon Heights Coalition's claims against three Beacon Heights appellees—Dee's, Inc., Frank Perrotti & Sons, Inc., and Manafort Brothers, Inc./ Connecticut Waste Processing, Inc.—partly for the same reasons it rejected the claims against the generators and partly because the court found that these transporters did not select the site of disposal. On remand, the district court should consider whether summary judgment remains appropriate in these three cases in light of our discussion of transporter liability and the other issues addressed in our opinion.

### C. Sua Sponte *Dismissals*

As noted, the district court dismissed claims *sua sponte* against 32 appellees (listed below) for "want of substantiation." While district courts have authority to take such action in complex cases involving dozens of summary judgment motions, the district

court could not grant *sua sponte* summary judgment without giving the coalitions notice and an opportunity to adduce evidence in opposition. Here, because these appellees made no motion for summary judgment, no opposition papers were prepared by the coalitions. This procedure leaves us without the benefit of a record in these cases.

These 32 *sua sponte* grants of summary judgment must be reversed and the trial court may again consider *sua sponte* summary judgment after giving appellants ten days to come forward with their evidence. It should then consider that evidence in light of the legal standards we have enunciated and determine if summary judgment is appropriate.

●● *Laurel Park and Beacon Heights Combined Claims:*

● Ashmore Trucking Company, Thomas Ashmore, George Clark, Gerald Metals.

●● *Laurel Park Only:* John Ashmore, Northeast Utilities/ Connecticut Light & Power Co., Quality Rubber Products.

●● *Beacon Heights Only:* Armand's Auto Service, Beacon Outing Club, John Betkoski, Edward Betkoski, Brass Rail Restaurant/Cafe, Capozziello Brothers, C.R. Gibson, E. Eric Arsan Refuse, Elk's Lodge # 967, George's Floor Covering, High Ridge Homes/Apartments, Korvette Services, Latella Carting Co., Long Meadow Cafe, Nelson Mendes, Naugatuck Y.M.C.A., Peter Paul Cadbury, Ray's Hardware, David Rupsis, Sperry Rand Corporation, Triangle Services, Turner Construction, Vieria Agency.

### D. *Municipal Generators*

The district court considered the municipal appellees as a single group and granted summary judgment dismissing the coalitions' actions against them. In so doing it ruled that wastes that were not themselves tested as hazardous, but which incorporated components that were hazardous wastes, did not bring disposers of such waste within CERCLA. The court also ruled that liability does not lie if the waste disposed of would release a hazardous substance only on the intervention of another force. Further, it weighed

the Brown affidavit with other evidence and found it wanting. In our view these rulings were error.

"Liability under CERCLA depends only on the presence in any form of listed hazardous substances." *Murtha I*, 958 F.2d at 1201. The district court, in support of its holding, stated that the coalitions "provided no analysis or authority to the contrary." *Murtha III*, 840 F.Supp. at 188. But in fact, the Beacon Heights Coalition referred the court to the very passage in *Murtha I* just quoted.

The second ruling erroneously required the appellants to prove causation for the release. Further, in weighing the Brown affidavit against the backdrop of the EPA Municipal Policy and deciding against pursuing the municipal generators as potentially responsible parties, the trial court found that spot checks conducted by the municipalities "substantially undercut" Brown's affidavit. *Murtha III*, 840 F.Supp. at 189. This is precisely the sort of weighing of evidence in which courts may not engage when deciding summary judgment motions. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994) ("On a motion for summary judgment, the court is not to weigh the evidence or ... resolve issues of fact, but only to determine whether there are issues to be tried."). Moreover, the EPA's decision whether or not to charge these appellees as potentially responsible parties is not relevant when determining liability.

We remand as to the following 19 municipal generators:

●● *Laurel Park and Beacon Heights Combined Claims:* Town of Beacon Falls, Town of Bethany, Connecticut Resource Recovery Authority, Town of Hamden, Town of Killingworth, Town of Middlebury, Borough of Naugatuck, Town of Orange, Town of Plymouth, Town of Seymour, Town of Thomaston, City of Waterbury.

●● *Laurel Park Only:* New Haven Housing Authority, Watertown Housing Authority, Town of Watertown, Town of Woodbury.

●● *Beacon Heights Only:* City of Milford, Town of Stratford, Town of Westport.

### E. *Remaining Cases* [7]

#### 1. *Laurel Park and Beacon Heights Combined Claims*

There are 27 remaining cases for which a brief explanation follows:

• Adams Service Station (Adams): This motorcycle and snowmobile business was managed by Stanley P. Radauskas from 1954 until 1982. Radauskas explained that the service station disposed of "cardboard boxes, miscellaneous packaging materials, and a small amount of paper office trash." In deposition testimony, he also acknowledged the disposal of windshield cleaning fluid, plastic bags, used paper gaskets from motorcycles, spark plugs, and light bulbs. Radauskas claimed that "none of the [wastes] disposed of by the service station ... contained any [CERCLA hazardous substances]." After reviewing these facts, Dr. Brown concluded that Adams' waste included lead, trichloroethane, and trichloroethylene, three CERCLA hazardous substances found in the Beacon Heights Landfill.

Although the district court concluded that none of the products disposed of are listed by EPA as hazardous substances, the products have component parts that are hazardous substances. Hence, the waste allegedly disposed of by Adams falls within CERCLA.

• Bristol Flowed Gasket Company (BFGC): BFGC produces metal stampings. Murtha removed BFGC's "general rubbish, including cardboard, [office] waste basket contents, garbage from the company cafeteria, junk mail, and floor sweepings." Dr. Brown concluded that these wastes commonly include several CERCLA hazardous substances, including methylene chloride, benzene, trichloroethane, and diethyl phthalate. All of these substances were found at the landfills.

The district court relied on the EPA's decision not to designate BFGC as a potentially responsible party and also found that no direct evidence of BFGC's disposal of hazardous substances was produced.

• The Coffee Shop: This Waterbury restaurant disposed all of its waste at the Murtha landfills until 1978. The wastes included containers for Clorox, 409 detergent, Drano, Tide soap, Lysol, and Ajax, as well as cleaning rags and towels. It also disposed of plastic wrappings from food packaging material and empty beverage containers. An employee with personal knowledge of the waste disposed by the appellee averred that none of the restaurant's waste contained any hazardous substances. Dr. Brown concluded that this waste contained xylenes and diethyl phthalate, two hazardous substances found in leachates from both landfills.

The district court stated that because the appellee used the cleaning substances listed above, it made no sense to believe that any of the product would still remain in a discarded container; and since whatever amounts discarded were "minuscule," it granted summary judgment. *Murtha III*, 840 F.Supp. at 184. The trial court also stated that none of the cleaning products is listed as a hazardous substance, and that the mere presence of a named hazardous substance as a constituent element of a product does not make the product a hazardous substance. We reject all of these bases of the decision.

• Crelan Construction: The district court granted summary judgment, saying that the record reflected no evidence that the movant disposed of hazardous substances at either landfill. The Beacon Heights Coalition concluded that Crelan had neither complied with discovery obligations nor submitted an affidavit in support of its motion. The district court did not rule on this contention, nor does either coalition argue that Crelan's alleged failure to comply with discovery provides a basis for reversal. Nonetheless, we vacate and remand for reconsideration in light of our other holdings today.

• First National Supermarkets: The district court found that because no claim was asserted against appellee in the amended complaint, the case against this defendant should be dismissed. It agreed with appellee that the claim was originally made against FNS–Naugatuck. Because the complaint

---

7. Cases against the following defendants were voluntarily dismissed: P. Francini & Co.; Ideal Manufacturing Co.; Jetzon Tire Co.; Litton Systems, Inc.; and Sanitary Refuse Co.

charged FNS–Naugatuck, apparently a different entity than this appellee, we affirm.

● Horizon Homes: Horizon Homes owned 12 apartment buildings. By all accounts, it disposed of household waste, including Clorox containers, furniture and floor polish containers, pesticide containers and traps, and containers of ammonia and shampoo. Dr. Brown concluded that this array of waste included several hazardous substances also found in leachates from both landfills.

The district court found that because these containers would ordinarily include only "minuscule residues," *Murtha III,* 840 F.Supp. at 186, there could be no liability. As there is no quantitative requirement for CERCLA liability, the fact that only minimal amounts were generated might be relevant in liability apportionment, but it cannot serve to bar liability entirely.

● Hospital Marketing Services Co. (HMS): HMS contracted for waste disposal exclusively with Murtha from 1977–79 and 1983–87. It manufactured cold packs that contained calcium chloride and (after December 1987) magnesium sulfate. HMS' waste, according to appellants' evidence, included polyvinyl chloride packaging, ammonium nitrate, urea, and medical and office supplies. Dr. Brown concluded that HMS's waste included hazardous wastes found in both landfills, including acetone, phenol, xylenes, trichloroethane, and diethyl phthalate.

The district court granted HMS's motion for summary judgment because none of the products discarded is listed as a hazardous substance and because the Brown affidavit did not identify their composition with specificity. It is hard to know precisely what the district court meant. Dr. Brown looked at the waste discarded and then determined whether it included hazardous substances. It is reasonable to infer that some raw materials were disposed of in the manufacturing process. Even though HMS denied the existence of any proof that it generated hazardous substances, this showing was sufficient to raise a disputed issue of material fact.

● Lombard Brothers, Inc./North Penn Transfer, Inc.: According to the district court, Lombard Brothers, Inc. was acquired by North Penn Transfer, Inc. in 1984, and on February 10, 1992, North Penn Transfer, Inc. filed for bankruptcy protection. The industrial coalitions did not respond to the summary judgment motion filed by this appellee because of an automatic stay issued by the bankruptcy court pursuant to 11 U.S.C. § 362.

The district court granted Lombard Brothers' motion for summary judgment and dismissed the claim against North Penn Transfer, Inc. without prejudice because of the bankruptcy stay. As the automatic stay protecting North Penn necessarily protects its subsidiary, Lombard Brothers, we believe that the claims against both entities should be dismissed without prejudice until the stay is lifted. We therefore affirm the dismissal without prejudice until the stay is lifted.

● McDonald's Corporation: In their amended complaint, the coalitions sued "McDonald's Restaurant[,] a corporation organized and existing under the laws of the State of Connecticut," and mailed a summons and complaint to "McDonald's Restaurant, Rubber Avenue, Naugatuck, Connecticut 06770." However, no "McDonald's Restaurant" is incorporated in Connecticut. In their motion opposing summary judgment, the coalitions referred to this party as "McDonald's Corporation," but again, no such entity is incorporated in Connecticut, and the McDonald's unit on Rubber Avenue in Naugatuck is not operated by McDonald's Corporation.

McDonald's Corporation moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(4) and (5) for insufficiency of process and insufficiency of service of process. As the coalitions did not address this claim, the district court properly granted the motion to dismiss. We affirm.

● Neal's Coffee Shop (Neal Hennessey): Neal's Coffee Shop (until 1977) was a restaurant in Naugatuck, Connecticut that disposed of some 300 lbs. of waste each week, including food packaging, "used, empty, cleansing agent containers and styrofoam products." *Murtha III,* 840 F.Supp. at 189. Dr. Brown opined that such waste included diethyl phthalate, a hazardous substance

commonly found in food packaging. Neal Hennessey stated that he "ha[d] no knowledge" of whether his waste included hazardous substances. The district court granted this appellee's motion for summary judgment without explanation. As is clear from the foregoing, material facts remain disput-.ed.

• Portanova Trucking Co., Inc.: This party moved for summary judgment, and neither coalition opposed the motion; Dr. Brown's affidavit is silent as to Portanova. The district court dismissed the action. We affirm.

• Portuguese Club: This Naugatuck, Connecticut social club disposed (according to information provided by Frank Rodrigues, one of its officers) waste that included "toilet area trash, catering/food garbage, and bar debris (empty glass bottles and boxes), food by-products from catering operations," and some office waste. Rodrigues averred that, to the best of his knowledge, none of the Club's waste contained any hazardous substances. Based on this, Dr. Brown determined that waste disposed of by the Portuguese Club included several hazardous substances. Despite the factual dispute, the district court granted the Club's motion for summary judgment, finding no evidence that the Club's waste included hazardous substances.

• Shore's Auto Parts: The district court granted summary judgment, commenting that the record contains no evidence that this appellee disposed hazardous substances at Beacon Heights or Laurel Park. See our holding, *supra*, for Crelan Construction.

• Stauffer Chemical Company: This chemical company disposed of office trash, empty paint cans, oil tubes, grease cans, wax containers, floor cement cans and spray containers, and burned light bulbs. According to Dr. Brown, these and other wastes disposed of contained several hazardous substances that were also found in leachates from the two facilities. The district court granted summary judgment. Appellee recognized that "traces" or "*de minimis*" amounts of hazardous substances might have been discarded.

• Steve's Tire and Battery Salvage: Steve's Tire's waste includes scrap tires. According to the Brown affidavit tires will, under normal landfill conditions, leach methyl ethyl ketone, lead, chromium, toluene, and phenol, all of which were found in both landfill leachates. The district court concluded that tires are not hazardous substances and granted summary judgment. The court had also noted that Brown provides no basis for his opinion that tires release hazardous substances. However, Dr. Brown's affidavit specifically relies on five reports that discuss the types of hazardous substances ordinarily released by tire products and is sufficient to raise an issue of disputed material fact.

• The Stop & Shop Supermarket Company: This food retailer acknowledges disposing of waste that included cardboard, food products, some wood and some plastic, shipping containers, and packaging materials. An employee of the retailer stated that, to the best of his knowledge, this appellee's waste contained no hazardous substances. Dr. Brown, however, considered the waste disposed of by Stop & Shop and found that it included several hazardous substances. The district court granted summary judgment, concluding that the waste disposed of was insufficient to impose CERCLA liability. The Brown affidavit, however, raises a genuine dispute over a material fact.

• Trowbridge House Apartments; Valley Mobile Homes Park/Valley Motor Trailer Sales: These appellees both operate residential complexes and each provided a dumpster for the household waste disposed by their tenants. Trowbridge denied any knowledge of the specific wastes that might have been disposed in its dumpster. Dr. Brown concluded that if the household waste was similar to household waste generally disposed of (an inference unchallenged by the appellee), it contained several hazardous substances found in both landfills. The district court granted summary judgment to Trowbridge. Similarly, as to Valley Mobile Homes Park/Valley Motor Trailer Sales, the district court disregarded Dr. Brown's affidavit detailing the kinds of hazardous substances ordinarily found in household waste and granted summary judgment.

• Waterbury Pressed Metals, Inc. (WPM): WPM manufactures plumbing specialties and disposed of solid wastes, including paper, scrap rubber, and plastics, and other "ordinary" trash through the Murthas. WPM officials contend that they did not generate any hazardous waste found at the facilities. Dr. Brown concluded that trichloroethane, lead, cadmium, dimethyl phthalate, and diethyl phthalate, hazardous substances all found in Laurel Park leachate, were also in WPM's waste. Despite the disputed facts, the district court found the record "devoid of evidence" that WPM disposed of hazardous waste at either facility and granted summary judgment.

## 2. *Laurel Park Only*

• Daddio's: The district court granted summary judgment for the same reasons as in Crelan Construction. See our conclusion, *supra*, in Crelan.

• General Roofing & Sheet Metal Company (General Roofing): General Roofing disposed of "[p]eastone gravel, asphalt rag felt and fiberglass roof insulation." Dr. Brown opined that this waste included benzo(a)pyrene and methyl ethyl ketone, two hazardous substances found in the Laurel Park leachate. The district court found that General Roofing was not liable and granted summary judgment, rejecting "[t]he Brown assumption that a roofer necessarily disposes of [hazardous substances]." However, Brown made no such assumption, but instead considered the information provided by General Roofing in its response to discovery, determined that hazardous substance were ordinarily found in these wastes, and thereby raised a disputed material fact.

• Nasco, Inc.: Nasco is a service firm that slits coils of metal into narrow widths. In discovery and in a summary judgment affidavit from its president, Nasco admitted that Murtha handled its general trash, including office waste, wooden skids, paper wrappings, some plastics, tin cans, cardboard boxes, and other paper waste. Other waste generated by Nasco, such as dirty rags and steel scrap, were not disposed of in the Beacon Heights or Laurel Park facilities. Based on this in-

formation, Dr. Brown concluded that Nasco's waste included dimethyl phthalate, diethyl phthalate, trichloroethane, cadmium, and lead, all hazardous substances. The district court granted Nasco's motion for summary judgment, concluding that the Brown affidavit does not constitute valid evidence.

• U.S. Prolam: U.S. Prolam's operations in Waterbury, Connecticut involve the coating of glass fabric with various resins and electrical lamination. According to U.S. Prolam, it disposed of "inert" edge trim (epoxy fiberglass), laminate, prepreg, cardboard boxes, scrap metal, and ordinary office supplies. On information and belief, two officials for Prolam stated that they maintained a separate waste disposal process for hazardous substances that was distinct from the disposal of general waste at Laurel Park. Dr. Brown determined that this waste included numerous hazardous substances that were found in Laurel Park. The district court accepted the affidavits from the Prolam officials, stated that the Brown affidavit was unavailing, and granted summary judgment to Prolam. In so doing the trial court impermissibly weighed the evidence.

## 3. *Beacon Heights Only*

• Connecticut Sheet Metal Co. (CSM): This company denied disposing "any hazardous wastes" at the Beacon Heights landfill. However, in deposition testimony, CSM admitted disposing of packaging materials, cardboard boxes, wooden crates with nails or staples, paper wrapping, and other office wastes. On this basis, Dr. Brown concluded that CSM's waste included trichloroethylene, diethyl phthalate, trichloroethane, and lead. The district court granted summary judgment despite the existence of a triable issue.

• Derby Tire Co., Inc.: Derby Tire disposed of scrap tires at Beacon Heights. The district court granted summary judgment because tires are not listed as hazardous substances by EPA. See our conclusion, *supra*, in Steve's Tire.

• Meyers & Schwartz, Inc.: The district court granted summary judgment here for the same reasons that it granted summary judgment to Derby Tire. See our conclusion, *supra*, in Steve's Tire.

538

• Waterbury Companies, Inc.: Waterbury Companies' business is manufacturing plastic moldings and brass metal stampings. Time-Mist, once a division of Waterbury Companies and now merely a product line, manufactured timed aerosol dispensing devices. This appellee disposed of office waste, including paper, lunch wastes, and damaged plastic goods, in the Murtha landfills. Waterbury denies knowing that "any component of its disposable waste by-product contributed to the pollution" at the facilities. Dr. Brown concluded, based on this evidence, that trichloroethane, diethyl phthalate, and lead—hazardous substances also found in Beacon Heights landfill—were disposed of by this appellee. Despite Waterbury's contentions, the Brown affidavit did not rely on Waterbury's disposal of brass coils, greases, or pesticides. The district court granted summary judgment even though material facts remained genuinely disputed.

