262 F.3d 169 (2nd Cir. 2001)
 CITY OF NEW YORK, RUDOLPH W. GIULIANI, AS MAYOR OF THE CITY OF NEW YORK, & CLAIRE SHULMAN, AS PRESIDENT OF THE BOROUGH OF QUEENS, PETITIONERS,
v.
NORMAN Y. MINETTA, SECRETARY OF TRANSPORTATION; SUSAN MCDERMOTT, DEPUTY ASSISTANT SECRETARY FOR AVIATION AND INTERNATIONAL AFFAIRS, U.S. DEPARTMENT OF TRANSPORTATION & FEDERAL AVIATION ADMINISTRATION, RESPONDENTS.
 Docket No. 00-4124
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: January 12, 2001
Decided August 20, 2001
 
 Petition for review of four orders of the Secretary of Transportation granting take-off and landing slots to airlines servicing New York's LaGuardia and Kennedy Airports. Petitioners claim that the Secretary failed to perform a required environmental review, did not consider certain statutory factors, and did not evaluate each airline's application individually prior to issuing the orders. We conclude that no environmental review was required and that the Secretary has complied with the statute. We therefore deny the petition for review.[Copyrighted Material Omitted]
 Susan E. Amron (Michael D. Hess, Corporation Counsel of the City of New York, of counsel), New York, New York, for Petitioners.
 F. Franklin Amanat, Assistant United States Attorney (Loretta E. Lynch, United States Attorney for the Eastern District of New York, and Deborah B. Zwany and Stanley N. Alpert, Assistant United States Attorneys for the Eastern Districtof New York, and Paul M. Geier, Assistant General Counsel for Litigation and Thomas L. Ray, Senior Trial Attorney, U.S. Department of Transportation, Office of the General Counsel, Washington D.C., of counsel), Brooklyn, New York, for Respondents.
 Lorraine B. Halloway, Crowell & Moring L.L.P. (r. Bruce Keiner, Jr., of counsel), Washington, D.C., for Amici Curiae Regional Airline Association in support of Respondents.
 Robert E. Cohn, Shaw, Pittman, Potts & Troebridge (Alexander Van der Bellen, and W. Paul Zampol, General Attorney, Delta Air Lines, Inc., Atlanta, Georgia, and Robert P. Silverberg, Silverberg, Goldman and Bikoff, L.L.P., Washington, D.C., of counsel), Washington, D.C., for Amici Curiae Delta Connection Carriers in support of Respondents.
 Before: Van Graafeiland, Winter, And Calabresi, Circuit Judges.
 
 Winter, Circuit Judge
 
 1
 The City of New York, its Mayor, and the President of the Borough of Queens (collectively "City") petition for review of four orders of the Secretary of Transportation granting take-off and landing slots at New York's LaGuardia and John F. Kennedy International Airports. See In re The Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Orders 2000-4- 10-13, Nos. OST-2000-7175-7178 (Dep't of Transp. Apr. 14, 2000) [hereinafter Orders].
 
 
 2
 The City claims that the orders must be overturned because the Secretary failed to: (i) assess the environmental impact of the orders; (ii) exercise discretion in granting the orders by considering additional statutory factors concerning the domestic economic benefits from granting each request; and (iii) review the merits of each application individually. Respondents, the Secretary of Transportation, the Deputy Assistant Secretary for Aviation and International Affairs, the United States Department of Transportation, and the Federal Aviation Administration (collectively "Secretary"), argue that we have no jurisdiction to review the orders and that, even if jurisdiction exists, no environmental assessment was required and the Secretary complied with the relevant statutory requirements. We conclude that we have jurisdiction but agree with the Secretary on the merits and deny the petition for review.
 
 BACKGROUND
 
 3
 The present petition arises from the federal regulation of air traffic at four airports -- LaGuardia, Kennedy, Chicago's O'Hare International, and Washington, D.C.'s Reagan National. Congress's phasing out of regulation of aviation routes in the 1970s, see Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705, removed regulatory limits on the number of flights at all but the four airports named above. These four, because of unusual congestion and delays, remain under the regulation of the Federal Aviation Administration ("FAA"). See 14 C.F.R. §§ 93.121-133 & 93.211-229.
 
 
 4
 In 1968, the FAA adopted the "High Density Rule" ("HDR"), which limited the number of flights at these four (high density) airports and required airlines to obtain "slots" -- reservations for takeoffs and landings -- before offering services during regulated time periods. See id. By the early 1990s, however, the HDR was perceived as a barrier to improved service, in part because new air carriers were unable to establish service due to the lack of slot availability. See H.R. Rep. No. 106-167, at 225-26, reprinted at 1999 WL 355951 (1999). As a result, in 1994, Congress enacted a provision giving the Secretary discretion to grant exemptions from the slot requirement where the Secretary "finds it to be in the public interest and the circumstances to be exceptional." Pub. L. No. 103-305, § 206(c)(1), 108 Stat. 1569 (1994) (prior to 2000 amendment). By the late 1990s, however, Congress, dissatisfied with the number of exemptions granted, concluded that "[e]xpanding the current exemptions or adding new exemptions no longer seems to be the best approach," H.R. Rep. No. 106-167, at 226, and decided to eliminate the HDR at LaGuardia, Kennedy, and O'Hare, while retaining some limits at Reagan National, see id. at 227, 229.
 
 
 5
 The new law, the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"), Pub. L. No. 106-181, 114 Stat. 61 (2000) (codified in scattered sections of 49 U.S.C.), phases out the HDR at LaGuardia and Kennedy as of January 1, 2007, see 49 U.S.C. § 41715(a)(2). The Act provides interim slot rules to allow new entrants to offer services at the two airports until that date. The legislation is generally intended to increase the number both of carriers offering services and of non-stop flights from the two airports to small hub or non-hub airports through the use of regional jets.
 
 
 6
 Because the City's petition for review requires a close reading of AIR21, we set forth in some detail the pertinent provisions of AIR21. Section 41716 provides the interim slot rules at the New York airports:
 
 
 7
 (a)... Subject to section 41714(i), the Secretary of Transportation shall grant, by order, [slot] exemptions... to any air carrier to provide nonstop air transportation, using an aircraft with a certificated maximum seating capacity of less than 71, between LaGuardia Airport or John F. Kennedy International Airport and a small hub airport or nonhub airport--
 
 
 8
 (1) if the air carrier was not providing such air transportation during the week of November 1, 1999;
 
 
 9
 (2) if the number of flights to be provided between such airports by the air carrier during any week will exceed the number of flights provided by the air carrier between such airports during the week of November 1, 1999; or
 
 
 10
 (3) if the air transportation to be provided under the exemption will be provided with a regional jet as replacement of turboprop air transportation that was being provided during the week of November 1, 1999.
 
 
 11
 (b)... Subject to section 41714(i), the Secretary shall grant, by order, [slot] exemptions... to any new entrant air carrier or limited incumbent air carrier to provide air transportation to or from LaGuardia Airport or John F. Kennedy International Airport if the number of slot exemptions granted under this subsection to such air carrier with respect to such airport when added to the slots and slot exemptions held by such air carrier with respect to such airport does not exceed 20.
 
 
 12
 (c) Stage 3 aircraft required.--An exemption may not be granted under this section with respect to any aircraft that is not a Stage 3 aircraft (as defined by the Secretary).
 
 
 13
 49 U.S.C. § 41716 (emphases added).
 
 
 14
 The requirements of Section 41716 are "[s]ubject to section 41714(i)." That Subsection provides that, within 60 days after an application for a slot exemption is filed, the Secretary must approve the request if the Secretary determines that the requirements of the section under which the request is made are met; [] return the request to the applicant for additional information relating to the request to provide air transportation; or [] deny the request and state the reasons for its denial.
 
 
 15
 49 U.S.C. § 41714(i)(2). The 60-day period is tolled if the Secretary requests additional information from the applicant. See id. § 41714(i)(3). The Subsection also provides:
 
 
 16
 If the Secretary neither approves... nor denies the request... within the 60-day period... then the request is deemed to have been approved on the 61st day....
 
 
 17
 Id. § 41714(i)(4).
 
 
 18
 Section 41717 of AIR21 governs interim exemptions at O'Hare and is substantially similar to Section 41716's regulation of New York airports quoted above. Section 41718 governs only Reagan National and is markedly different in two respects. First, as set out in detail in the margin,[1] it limits the total number of slot exemptions that may be granted at Reagan National and gives the Secretary discretion to develop criteria to determine the distribution of the limited number of slot exemptions. Second, Section 41718 is the only section that refers to the environmental impact of granting more slot exemptions. Specifically, Subsection 41718(e) states:
 
 
 19
 Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment.
 
 
 20
 Finally, Section 41715, which provides general rules governing the phase-out of the slot rules at all four airports, states: (
 
 
 21
 c) Factors to consider. --
 
 
 22
 (1) In general.--Before the award of slot exemptions under sections 41714 and 41716-41718, the Secretary of Transportation may consider, among other determining factors, whether the petitioning air carrier's proposal provides the maximum benefit to the United States economy, including the number of United States jobs created by the air carrier, its suppliers, and related activities. The Secretary should give equal consideration to the consumer benefits associated with the award of such exemptions.
 
 
 23
 (2) Applicability.--Paragraph (1) does not apply in any case in which the air carrier requesting the slot exemption is proposing to use under the exemption a type of aircraft for which there is not a competing United States manufacturer.
 
 
 24
 Id. § 41715(c).
 
 
 25
 On April 14, 2000 -- nine days after the President signed AIR21 into law -- the Secretary issued four orders granting applications for slot exemptions at LaGuardia and Kennedy. See Orders. Rather than reviewing the applications for exemptions individually, the Secretary decided that it would be more efficient to open four dockets -- two for each New York airport[2] -- and to issue a blanket order in each docket granting slot exemptions to any airline that certified its satisfaction of the criteria set forth in Section 41716. In the Secretary's view, an applicant carrier would be entitled to an exemption simply by providing the required information and certifying -- subject to an enforcement action for false certification -- that it satisfies the criteria for obtaining slot exemptions under Section 41716. Each order also contained a footnote stating that the Secretary was not required to assess the environmental impact of the order prior to its issuance. See id. at 1 n.1 (orders governing § 41716(b)); id. at 2 n.2 (orders governing § 41716(a)). The orders did not purport to have considered the factors enumerated in Subsection 41715(c).
 
 
 26
 All of the applications for slot exemptions at issue on this petition were filed before the President signed the legislation, apparently in anticipation of AIR21's becoming law. The City submitted comments in response to thirteen of those applications,[3] arguing, inter alia, that an environmental assessment was required before the slot exemptions could be granted. After the orders were issued, the City filed papers with the Secretary objecting to the orders pertaining to LaGuardia -- functionally a motion for reconsideration, or so we shall call it -- again arguing that an environmental review was required before granting slot exemptions. None of the papers filed by the City disputed any factual assertion in any application for a slot exemption.
 
 
 27
 However, before the Secretary could act on the City's motion for reconsideration, the City filed its petition for review in this court, claiming that: (i) a required environmental review was not done; (ii) the issuance of four blanket orders, rather than individual orders reviewing each application, was improper; and (iii) the Secretary should have considered the factors listed in Subsection 41715(c) before issuing the orders. After filing its petition, the City filed a motion to withdraw its request for reconsideration with the Secretary, which the Secretary granted. Nevertheless, the Secretary elected sua sponte to discuss the City's objections. See In Re AIR21, Order 2000-9-18, Nos. OST-2000-7175, 7176 (Dep't of Transp. Sept. 21, 2000) (Order on Petition for Reconsideration). The discussion asserted that, because AIR21 leaves him with no discretion over the grant of slot exemptions at the New York airports and imposes short, mandatory deadlines, an environmental analysis was not required under the governing statutes. See id. at 4, 8. It is to these issues that we now turn.
 
 DISCUSSION
 
 28
 a) Jurisdiction
 
 
 29
 We have jurisdiction over petitions for review of the Secretary's orders under 49 U.S.C. § 46110. However, our jurisdiction extends only to objections raised in the proceedings before the Secretary unless "there was a reasonable ground for not making the objection in the proceeding." Id. § 46110(d). The Secretary contends that the City's petition is jurisdictionally barred because, inter alia: (i) the objections the City raised before the Secretary with respect to LaGuardia are different from those raised in its petition for review; (ii) the City did not raise its objections to the grant of slot exemptions at Kennedy in the proceedings before the Secretary; and (iii) the City never objected to the Secretary's decision not to review each application individually.
 
 
 30
 We conclude that we have jurisdiction. The City's objection to the application by Continental Airlines for slot exemptions at LaGuardia, filed before the orders were issued, discussed the impact of additional slot exemptions at both LaGuardia and Kennedy. Further, that objection specifically stated, "[A]nother meaningful environmental analysis must be conducted before any new slots are awarded at either LaGuardia or JFK." (emphasis in original). Motion For Leave to File Late Answer and Answer of the Office of the Queens Borough President, City of New York, Docket No. OST-00-7083-2 (March 29, 2000) at 7. Although the City did not discuss the Secretary's discretion to grant slot exemptions under AIR21 in particular, AIR21 had not yet been signed into law either at the time that Continental applied for the exemptions or at the time that the City responded. In saying this, however, we note that Continental's application was obviously drafted in anticipation of AIR21's imminent signing into law because the application certified that the type of aircraft to be used did not have a competing American manufacturer, a statement clearly related to AIR21's Subsection 41715(c)(2).
 
 
 31
 Furthermore, the City also filed eleven other objections to applications for slot exemptions, two of which objected to the grant of exemptions at Kennedy in particular. The eleven objections were filed before the effective date of AIR21 and did not contain arguments based on that statute. However, a supplemental objection to one application was filed by the City during the nine-day period between the date AIR21 was signed and the date the orders were issued. It explicitly argued that AIR21 required an environmental review before the Secretary could grant slot exemptions under that Act.
 
 
 32
 Finally, it is uncontested that the City expressly raised the environmental review issue in its motion for reconsideration. Although the City withdrew that motion upon filing the present petition, it nevertheless clearly notified the Secretary: "While we are withdrawing our motion, we continue to object to the orders." Brief for Respondents at Appendix A, New York v. Minetta (2d Cir. 2001) (No. 00-4124). We therefore conclude that the City preserved its objections as to the need for environmental review. See Wagner Seed Co. v. Daggett, 800 F.2d 310, 314 (2d Cir. 1986) ("A presumption exists in favor of jurisdiction by federal courts over the actions of federal administrative agencies."); Bd. of Educ. v. Harris, 622 F.2d 599, 606 (2d Cir. 1979) (exercising jurisdiction over objections not raised below where objections could not have been made earlier).
 
 
 33
 The City concedes, however, that it did not object before the Secretary to his decision to issue four blanket orders, rather than orders responding to each application individually. Nevertheless, the City argues that it had a "reasonable ground," 49 U.S.C. § 46110(d), for not doing so. Prior to the date the orders were issued, it had no notice that the Secretary would use blanket orders because the Secretary had, until then, assigned individual docket numbers to each individual air carrier's application for slot exemptions. The City, moreover, had objected to each application individually.[4] We agree with the City that it had reasonable grounds for not raising its objection to the use of blanket orders earlier. See City of New York v. Slater, 145 F.3d 568, 571 (2d Cir. 1998) (per curiam) (reaching claim not raised by City in 1997 proceedings before Secretary).
 
 
 34
 b) The Need for an Environmental Review
 
 
 35
 The City's argument regarding the need for environmental review is based on the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., which provides, in relevant part:
 
 
 36
 [A]ll agencies of the Federal Government shall... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on [] the environmental impact of the proposed action....
 
 
 37
 42 U.S.C. § 4332(2)(C)(i). Although the Secretary failed to make a finding that the granting of slot exemptions is not a "major Federal action" that "significantly affect[s] the... environment," the Secretary did not prepare or issue an environmental impact statement ("EIS") with the orders. Rather, the Secretary argues that AIR21's non-discretionary mandates and its imposition of short deadlines relieves the Secretary from having to comply with NEPA.
 
 
 38
 "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.... If the intent of Congress is clear,... the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.... [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984); see Skubel v. Fuoroli, 113 F.3d 330, 335 (2d Cir. 1997). Although the Secretary is not charged with administering NEPA, his conclusion that an EIS was not required was based not on his interpretation of NEPA but, rather, on his construction of AIR21, which he is charged with administering. We must, therefore, if necessary, apply Chevron deference to his decision.
 
 
 39
 NEPA directs that it is to be applied "to the fullest extent possible." 42 U.S.C. § 4332. Nevertheless, courts have fashioned exceptions to NEPA's requirement of environmental review, two of which are relevant to this appeal. First, where the agency's decision does not "entail the exercise of... discretion," an EIS is not required. Amer. Airlines, Inc. v. Dep't of Transp., 202 F.3d 788, 803 (5th Cir.), cert. denied, 530 U.S. 1284 (2000) (internal quotation marks omitted); see Sac & Fox Nation v. Norton, 240 F.3d 1250, 1262-63 (10th Cir. 2001). One rationale underlying this exception is that, where the agency is required to take action, consideration of environmental factors will not -- indeed, cannot -- affect its decision. See Goos v. ICC, 911 F.2d 1283, 1295-96 (8th Cir. 1990); RESTORE: The N. Woods v. United States Dep't of Agric., 968 F. Supp. 168, 175 (D. Vt. 1997); cf. Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 788 (1976) ("NEPA was not intended to repeal by implication any other statute.") (internal quotations marks omitted).
 
 
 40
 The second pertinent exception to the EIS requirement arises when a statute imposes short, mandatory deadlines on an agency, thereby rendering compliance with NEPA's EIS requirement impossible. See Flint Ridge, 426 U.S. at 788-89. "[W]here a clear and unavoidable conflict in statutory authority exists, NEPA must yield." Id. at 777. If a timeframe imposed by the statute on an agency is too short for the agency to prepare an EIS, therefore, an EIS is not required. Id.
 
 
 41
 Both exceptions apply in the present case. First, Section 41716, which applies only to the New York airports, states that the Secretary "shall grant" slot exemptions, provided that the applicant carrier satisfies the conditions listed in the section. 49 U.S.C. § 41716(a)- (b). Those conditions, quoted supra, relate to the type of aircraft to be used, the route to be offered, the number of flights previously provided by, and the number of slot exemptions previously granted to, the carrier. See id. at (a)-(c). Section 41716 therefore provides objective standards that do not contemplate the exercise of judgment or discretion. If, for example, an air carrier intends to provide nonstop service from LaGuardia to a nonhub airport, using a "Stage 3 aircraft" that seats fewer than 71 people, and the air carrier was not providing that service during the week of November 1, 1999, Section 41716 requires that the Secretary "shall grant, by order, [slot] exemptions." Id. Section 41716 provides no exceptions to this mandate, much less exceptions that require an exercise of discretion.
 
 
 42
 The City relies upon two other provisions of AIR21 to support its argument. First, it relies on Subsection 41715(c), which lists various factors to be considered in granting slot exemptions. The City argues that the weighing of those factors is the essence of a discretionary judgment. Second, it relies on Section 41718, which creates an express exemption from NEPA for Reagan National, and on the lack of a similar provision applicable to either LaGuardia or Kennedy. The City infers a lack of an exemption for LaGuardia and Kennedy from this express exemption for Reagan National.
 
 
 43
 Turning to Subsection 41715(c), Subsection(c)(1) provides: "Before the award of slot exemptions under sections 41714 and 41716-41718, the Secretary of Transportation may consider, among other determining factors, whether the petitioning air carrier's proposal provides the maximum benefit to the United States economy...." The City argues that the express reference in (c)(1) to Section 41716 -- the section governing the New York airports -- requires an exercise of discretion involving judgments as to potential economic benefits before granting slot exemptions at those airports. The Secretary responds by relying on the canon of statutory construction under which specific provisions trump more general ones, noting a legislative history favorable to his position,[5] and, of course, calling for deference to his interpretation under Chevron.
 
 
 44
 We choose to resolve this issue on the narrow ground that the City has waived or forfeited any argument based on Subsection 41715(c). That Subsection requires, actually allows, an assessment of economic benefit only if the carrier-applicant intends to use an aircraft manufactured abroad for which there is a competing United States manufacturer. See § 41715(c)(2). As the Conference Report stated: "To the extent that DOT has discretion over the award of slot exemptions, it may consider whether the airline seeking the exemption will be using U.S. manufactured aircraft. This would not apply where the airline is proposing to use a type of aircraft for which there is not a competing U.S. manufacturer." H.R. Conf. Rep. No. 106-513, at 175 (2000), reprinted at 2000 WL 272075, at 412. The Secretary and two amici have argued that the air traffic at issue uses foreign-made jets for which there is no competing U.S. manufacturer. The City has simply not responded, a failure that we deem dispositive.
 
 
 45
 Because a procedural wrinkle is involved, we will review the history of this issue in some detail. While the City did raise the claim of a need for environmental review in proceedings before the Secretary, it never argued in that forum that the need arose because Subsection 41715(c)(1) required an exercise of discretion. In fact, the City never mentioned Subsection 41715(c) before the Secretary. Nor did the Secretary mention it either in his orders or in his response to the City's motion for reconsideration.
 
 
 46
 That is not to say, however, that Section 41715 was not a visible presence, albeit one lurking in the background. Three applications for slot exemptions -- two of which are subjects of the present petition for review -- clearly implicated Section 41715 by expressly stating that foreign aircraft for which there was no competing U.S. manufacturer were to be used. The City's objections to these applications did not address these statements. This gets to the procedural wrinkle. The applications and all but one of the City's objections to them -- the exception being in the nature of a supplemental objection -- were filed before AIR21 had become effective, April 5, 2000, the date on which the President signed it. The supplemental objection, filed after the effective date of AIR21 and before issuance of the orders, did not raise the need for a domestic economic assessment under Subsection 41715(c), even though the application failed to mention the type of aircraft to be used. Finally, the City's motion for reconsideration also failed to mention Subsection 41715(c).
 
 
 47
 The petition for review in this court did mention Section 41715 in claiming that issuance of the orders without considering the factors enumerated in Subsection (c)(1) was "arbitrary and capricious." Accordingly, the City's brief in support of the petition for review relied heavily upon Section 41715 as a statutory command ignored by the Secretary and thus as grounds for overturning the orders. The brief relied even more heavily, indeed as one of two lynch-pins, upon Section 41715 in support of its NEPA argument that an EIS was required. The brief did not, however, refer in any way to whether the conditions for the economic benefit assessment set out in Subsection (c)(2), namely the use of foreign aircraft and the existence of competing U.S. aircraft manufacturers, had been met.
 
 
 48
 The Secretary's brief, and those of the two amici, in opposition to the petition for review, asserted in plain terms that Subsection 41715(c)(1) did not apply because of Subsection (c)(2). The Secretary's brief stated that "[n]o U.S. firm makes regional jets" and that "[v]irtually all of the service to small hubs or non-hubs authorized under 49 U.S.C.A. § 41716(a) is operated with regional jets." Brief for Respondents at 37, New York v. Minetta, (2d Cir. 2001) (No. 00-4124). The City's reply brief once again asserted that Subsection 41715(c)(1) called for an exercise of discretion and, therefore, that NEPA applied. However, once again the City made no reference to Subsection (c)(2).
 
 
 49
 We thus face the following circumstances. The record before the Secretary regarding the use of foreign aircraft by applicants for slot exemptions and/or the existence of competing U.S. manufacturers is unclear, except for two applicants. The remaining applications covered by this petition for review never addressed the issue. Because the City's objections to the applications never mentioned Section 41715 for any purpose, the Secretary and the applicants may have perceived no reason to build a record in this regard. However, AIR21 was not effective when the applications were filed. While the applicants appear to have been assuming that AIR21 would govern the Secretary's consideration of the applications, we are loath to hold that the City waived or forfeited arguments based on Section 41715 when the legislation embodying it had not yet been signed by the President and all but one of the City's objections had been filed. The City's failure to mention Section 41715 in either the supplemental objection or in its motion for reconsideration is more troubling, but the Secretary's reliance on his lack of discretion as obviating the need for an EIS was not made clear until his sua sponte response to the withdrawn motion for reconsideration.
 
 
 50
 The City's petition for review raised Section 41715, albeit without a connection to NEPA. In the City's brief in support of the petition, Subsection 41715(c)(1) took on a starring role. It was repeatedly quoted and was featured both as part of the NEPA and arbitrary and capricious arguments. But that brief was also silent as to Subsection (c)(2). That silence has legal significance because it surely waived both arguments at least as to the two carriers that addressed the existence of a competing U.S. aircraft manufacturer in their applications and thereby signaled their claim that Subsection (c)(1) was inapplicable. See Pennsylvania v. Dep't of Health & Human Servs., 101 F.3d 939, 945 (3d Cir. 1996) (holding argument waived on petition for review where not adequately addressed in either main or reply brief); Commodity Futures Trading Comm'n v. Collins, 997 F.2d 1230, 1233 (7th Cir. 1993) (holding argument not mentioned in brief waived); cf. Torrington Extend-A-Care Employee Ass'n v. NLRB, 17 F.3d 580, 593 (2d Cir. 1994) (holding argument not raised in main brief supporting petition for review waived). It may also have waived both arguments as to the one carrier whose application was the subject of the supplemental objection, although the Secretary's reliance on his lack of discretion as grounds for not preparing an EIS was not made clear until his response to the withdrawn motion for reconsideration.
 
 
 51
 Whether the silence of the City's main brief waived or forfeited the issue as to other applicants is arguable. Given that two of the applications under review had mentioned the lack of a competing U.S. aircraft manufacturer and that (c)(1) was irrelevant if (c)(2) applied, some mention of (c)(2) in the City's brief would have been appropriate, if only to note the lack of a record as to other applicants. Certainly, however, once the Secretary and both amici explicitly invoked (c)(2) in their briefs, the City no longer had silence as an option without fatal consequences. If the City disputed the claims of the Secretary and the amici, the City's reply brief at the very least should have asserted that, based on information and belief, a genuine dispute of fact existed over the type of aircraft to be used and the existence of competing domestic manufacturers.
 
 
 52
 We cannot on this record determine whether the silence of the City's reply brief was due to the fact that pursuit of the (c)(2) issue would have been fruitless in terms of actually stopping any flights -- or any measurable number of flights -- or because of some other consideration. We can determine, nevertheless, that the choice of silence had to have been deliberate. All three briefs in opposition to the petition for review stated that (c)(1), one of the two lynch-pins of the City's statutory arguments, was entirely inapplicable because of (c)(2). This argument could not have remained unnoticed when the City's reply brief, with its heavy reliance on (c)(1), was drafted.[6] We therefore hold that the City's failure at any point in the proceedings to discuss (c)(2) forecloses the NEPA argument based on Subsection 41715(c)(1), either because it waived it -- intentionally abandoned it - - see Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999), cert. denied, 530 U.S. 1244 (2000), or forfeited it -- failed to take timely opportunities to assert it -- id. See also Carlisle Ventures, Inc. v. Banco Espanol De Credito, S.A., 176 F.3d 601, 609 (2d Cir. 1999) (holding appellant waived argument where its reply brief failed to respond to opposing party's contrary assertions and did not otherwise point to any evidence disputing those assertions).
 
 
 53
 We turn now to the City's argument based on Section 41718, which governs Reagan National and explicitly exempts the Secretary from filing an EIS. That Section states, in relevant part: "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment." 49 U.S.C. § 41718(e). The City argues that Subsection 41718(e)'s express exclusion of Reagan National from NEPA's EIS requirement implies that LaGuardia and Kennedy are subject to it because Section 41716 does not contain a similar exclusion. The City relies on the canon of statutory construction expressio unius est exclusio alterius, which "cautions against creating additional exceptions to complex statutory enactments" when Congress has explicitly provided for certain exceptions, B.F. Goodrich v. Betkoski, 99 F.3d 505, 517 (2d Cir. 1996); see United States v. Smith, 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (internal quotation marks omitted).
 
 
 54
 We disagree. The canon is inapplicable because we are not inferring an additional exception in the context of AIR21. In fact, the reason for the explicit exemption of Reagan National from NEPA works against, rather than for, the City. Unlike the statutory provisions governing LaGuardia, Kennedy, and O'Hare, the provisions governing Reagan National expressly require the Secretary to exercise discretion over the granting of slot exemptions. Reagan National is the only one of the four airports at which the number of slot exemptions is limited. See 49 U.S.C. § 41718(a) (limiting number of "beyond-perimeter" exemptions to 12); id. § 41718(b) (limiting number of "within-perimeter" exemptions to 12). It also is the only one of the four airports at which the Secretary is directed to grant exemptions only if he finds that the exemptions will "provide air transportation with domestic network benefits..., increase competition..., not reduce travel options..., and not result in meaningfully increased travel delays." Id. The Secretary is further directed, only with respect to Reagan National, to "develop criteria for distributing slot exemptions... in a manner that promotes air transportation" by new carriers, to communities currently lacking nonstop service to Reagan National, and to small communities, in a manner that will maximize "competitive benefits." Id. § 41718(b).
 
 
 55
 In contrast, Section 41716 requires only the satisfaction of objective and verifiable criteria for slot exemptions to be granted at LaGuardia and Kennedy. The express exemption of Reagan National was needed because discretionary decisions were called for under AIR21, whereas no such exemption was needed for the New York airports. The Reagan National exemption, therefore, actually supports our conclusion reached supra that the Secretary lacks discretion with respect to granting slot exemptions at the New York airports.
 
 
 56
 The Secretary also argues that, whether or not slot exemptions at LaGuardia and Kennedy are discretionary decisions, AIR21's short deadlines make compliance with NEPA impossible, thereby triggering the second relevant exception to the EIS requirement.
 
 
 57
 Section 41716 explicitly makes the grant of slot exemptions at LaGuardia and Kennedy "[s]ubject to section 41714(i)," 49 U.S.C. § 41716(a), (b). Subsection 41714(i) provides the Secretary with three options: he may (i) "approve the request if the Secretary determines that the requirements of the section under the request is made are met"; (ii) "return the request to the applicant for additional information relating to the request"; or (iii) deny the request. Regardless, if he neither approves nor denies the request within sixty days of receiving it, "then the request is deemed to have been approved on the 61st day." Id. § 41714(i)(4).
 
 
 58
 No one argues that it is possible to complete an EIS within a sixty-day period. See, e.g., Flint Ridge, 426 U.S. at 789 n.10 ("Draft environmental impact statements on simple projects prepared by experienced personnel take some three to five months to complete...."). The City, however, relies upon the tolling provision in Subsection 41714(i). Under Subsection 41714(i)(3), if the Secretary, rather than granting or denying it, "return[s] the request... for additional information," 49 U.S.C. § 41714(i)(2)(B), within twenty days after the request is filed, the "60-day period... shall be tolled until the date on which the additional information is filed with the Secretary." The City argues that the Secretary can therefore toll the deadline while it completes the EIS.
 
 
 59
 Again, we disagree. A statute permitting an agency to suspend a short statutory timeframe to allow applicants to supplement incomplete application materials cannot be read to give the agency the "inherent power to suspend the... deadline in order to prepare an [environmental] impact statement." Flint Ridge, 426 U.S. at 787. In Flint Ridge, the statute at issue vested the Department of Housing and Urban Development ("HUD") with only limited discretion regarding the effective date of a real estate developer's disclosure statement. The statute provided that such disclosure statements would automatically become effective after thirty days of filing unless HUD suspended the effective date. Under the statute, HUD had authority to suspend the effective date only where the filing was inaccurate or incomplete, in order to request additional information. The Supreme Court held that HUD's power to suspend the timeframe to remedy an inadequate filing did not imply that it could use its suspension authority in order to prepare an EIS. See id. at 790.
 
 
 60
 The present case involves almost identical circumstances. The Secretary can toll the sixty-day period only to request "additional information relating to the request to provide air transportation." 49 U.S.C. § 41714(i)(2)(B). Because, under Section 41716, the Secretary "shall grant" slot exemptions provided the carrier satisfies the objective requirements of that Section, any "additional information" needed from the carrier would be related to the objective criteria set forth in Section 41716, or the economic benefit assessment under Section 41715, if applicable. Those criteria do not relate to the preparation of an EIS.
 
 
 61
 c) The Orders Did Not Comply With AIR21
 
 
 62
 The City's argument here is based on the Secretary's failure to consider the factors enumerated in Subsection 41715(c)(1). Our discussion supra of the NEPA issue disposes of this claim also.
 
 
 63
 d) Issuance of Blanket Orders
 
 
 64
 The City also contends that the Secretary violated AIR21 when it issued the blanket orders granting slot exemptions to any carrier that satisfied the requirements of Section 41716. In support of its argument, the City again relies on Subsection 41715(c), which, to reiterate, allows the Secretary to "consider, among other determining factors," the domestic economic benefits of the carrier's proposal. If applicable, the economic assessment would be on an individual basis, and individual orders would be arguably appropriate. However, our discussion supra also disposes of this claim.
 
 
 65
 Given the mandatory nature of the Secretary's role in granting slot exemptions for LaGuardia and Kennedy, we see no reason (other than Subsection 41715(c)(1)) to doubt that the Secretary's view of an appropriate docketing procedure constitutes a permissible construction of the statute. As the Supreme Court has stated, "the formulation of procedures [i]s basically to be left within the discretion of the agencies to which Congress ha[s] confided the responsibility for substantive judgments." Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 524 (1978). The Secretary's use of the blanket orders, moreover, furthers Congress's intent by implementing the mandates of AIR21 efficiently and expeditiously.
 
 CONCLUSION
 
 66
 We have considered the City's remaining arguments and find them to be without merit. We therefore deny the petition for review.
 
 
 
 NOTES:
 
 
 [1]
 Section 41718 reads, in relevant part: Special rules for Ronald Reagan Washington National Airport (a)... The Secretary shall grant, by order, 12 exemptions... to operate limited frequencies and aircraft on select routes between Ronald Reagan Washington National Airport... if the Secretary finds that the exemptions will-- (1) provide air transportation with domestic network benefits...; (2) increase competition by new entrant air carriers or in multiple markets; (3) not reduce travel options for communities served by small hub airports and medium hub airports...; and (4) not result in meaningfully increased travel delays. (b)... The Secretary shall grant, by order, 12 exemptions... to air carriers for providing air transportation to airports that were designated as medium hub or smaller airports.... The Secretary shall develop criteria for distributing slot exemptions for flights within the perimeter to such airports under this paragraph in a manner that promotes air transportation-- (1) by new entrant air carriers and limited incumbent air carriers; (2) to communities without existing nonstop air transportation to Ronald Reagan Washington National Airport; (3) to small communities; (4) that will provide competitive nonstop air transportation on a monopoly nonstop route to Ronald Reagan Washington National Airport; or (5) that will produce the maximum competitive benefits, including low fares.
 
 
 [2]
 Each airport was assigned two dockets because Section 41716 contains two subsections with different requirements for obtaining exemptions. Subsection (a) applies to airlines providing service to small hub or nonhub airports, while Subsection (b) covers new entrant carriers and limited incumbent carriers. As set forth in the statute, the subsections also require the airlines to satisfy certain other criteria, including the type of aircraft used and the number of slots each already has. See 49 U.S.C. § 41716.
 
 
 [3]
 The City's motion to file its proposed supplemental appendix is granted.
 
 
 [4]
 The Secretary alternatively argues that, because the City's motion for reconsideration was an omnibus document objecting in general to a large number of applications for slot exemptions, rather than a series of motions objecting to individual applications, the City therefore acquiesced in the Secretary's use of blanket orders. We disagree. The City's use of a "blanket objection" neither constitutes acquiescence nor waives its right to object to the Secretary's use of blanket orders. It does, however, support the Secretary's argument that the use of blanket orders was reasonable in this matter. See infra Section d.
 
 
 [5]
 For example, the Conference Report stated: New York specific provisions. Slot restrictions at New York are eliminated after January 1, 2007. In the interim, DOT is directed to provide exemptions from the slot rules to any airline flying to the two New York airports if it will use aircraft with 70 seats or less and will (1) provide service to a small hub or non- hub that it did not previously service, (2) provide additional flights to a small hub or non- hub that it currently serves, or (3) provide service with a regional jet to a small hub or non- hub as a replacement for a prop plane.... DOT is also directed to grant exemptions to new entrants and limited incumbents for service to New York. H.R. Conf. Rep. No. 106- 513, at 174 (2000), reprinted at 2000 WL 272075, at 413 (emphases added).
 
 
 [6]
 Significantly, the City's reply brief recognized that the Secretary's brief argued that Section 41715 was inapplicable and cited pages 33- 36 of the Secretary's brief in that regard. See Reply Brief for Petitioners at 11, New York v. Minetta, (2d Cir. 2001) (No. 00- 4124). It responded to the arguments on the pages cited but failed to note that the pertinent section of the Secretary's brief ended, not on page 36, but on page 37, where the (c)(2) argument was made.